PRESENT: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee, JJ., and Russell, S.J.

OTIS SCOTT, III

v.    Record No. 062454               OPINION BY
                                JUSTICE BARBARA MILANO KEENAN
                                      November 2, 2007
COMMONWEALTH OF VIRGINIA


FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the circuit court abused its discretion in granting the Commonwealth's motion to have a defendant tried at the same time for nine robberies and other related crimes, which were based on incidents involving different victims that occurred in various locations on different dates over a four-month period.

Otis Scott, III, was indicted in the Circuit Court of the City of Virginia Beach for 27 offenses based on incidents that occurred between February 2003 and June 2003. Scott was indicted for nine counts of robbery and 18 other related charges, including three counts of burglary, one count of abduction with the intent to extort money, one count of attempted extortion, one count of attempted carjacking, and 12 counts of use of a firearm in the commission of these offenses.[1]

---

[1] The grand jury did not issue indictments for three of the charges against Scott, including two counts of use of a firearm in the commission of a felony and one count of burglary, until after the circuit court's ruling on the motion for joinder.

The Commonwealth filed a pretrial motion for joinder in the circuit court, requesting that the court join Scott's offenses for a single trial. The Commonwealth alleged that the robberies were part of a "common scheme or plan" and, therefore, could be tried together under the provisions of Rules 3A:6(b) and 3A:10(c). According to the Commonwealth, the robberies had the following similarities: the robberies occurred between 10:00 p.m. and 12:30 a.m. in residential neighborhoods; each of the victims was an adult and was alone at the time of the crime; each of the victims was threatened by the robber with a gun; the robber demanded personal property from each victim; in five of the robberies the victim was asked for a personal identification number (PIN) to provide access to a bank account or credit card; each victim had either just stepped out of a vehicle or was in a garage; most of the victims were threatened with or suffered bodily harm; and each robbery was committed by a lone, black male. The Commonwealth also asserted that justice did not require separate trials for the offenses under Rule 3A:10(c), because if each offense were tried separately, evidence of the other offenses would be admissible in the separate trials in order to prove the robber's identity.

These charges, however, were related to the robbery charges and were included in the trial against Scott.

2

Scott opposed the motion for joinder. After hearing oral argument on the motion, the circuit court granted the Commonwealth's motion to join the offenses in a single trial. The circuit court held that several of the Commonwealth's witnesses might be required to testify regarding the identity of the perpetrator in the different offenses, and that there were substantial similarities among the offenses that constituted a "modus operandi." The case proceeded to a jury trial.

At trial, Michelle P. Bingaman testified that about 10:30 p.m. on February 4, 2003, a black man approached her as she stepped out of her vehicle in the parking lot of her apartment building. Bingaman stated that after the man displayed a gun and demanded that she give him her purse, she complied and dropped her purse on the ground. According to Bingaman, the man directed her to lie on the ground "face down," and then the man fled on foot. Bingaman stated that after the man departed, she discovered that her purse had been taken. At trial, Bingaman identified Scott as the man who robbed her.

Florentina Lizan testified that at 10:40 p.m. on March 16, 2003, a black male approached her after she left her vehicle and walked onto the front porch of her residence. Lizan stated that the man held a gun to her head and said, "This is a holdup," and "Give me your money. If not, I'm going to kill you." After Lizan gave the man her wallet, the man demanded Lizan's PIN for

3

a certain credit card.  Upon Lizan's refusal to give the man her PIN, the man ran toward a vehicle parked across the street.

According to Lizan, the man spoke with her several times on the telephone after the robbery demanding her PIN.  The Commonwealth introduced into evidence telephone records indicating that the telephone calls to Lizan were made from a nearby convenience store.  At trial, Lizan identified Scott as her assailant.

The Commonwealth presented testimony from Katherine F. Holloway about the night she was robbed.  Holloway stated that about 10:00 p.m. on March 23, 2003, a black man with a gun appeared as she was unloading bags from her vehicle, which was parked in front of her home.  According to Holloway, the man said, "Give me your money and your credit cards," and Holloway complied.  Holloway testified that the man also asked for her "ATM number," and when she told him that she did not have one, he left.  Holloway was unable to identify her assailant.

Next, Jeffrey R. Ratliff testified that he was robbed on April 27, 2003, about 10:00 p.m.  Ratliff stated that he was in the driveway of a friend's home vacuuming the inside of a van when a man placed a gun to the back of Ratliff's head. According to Ratliff, the man, whom Ratliff described as a black male, asked for Ratliff's wallet and for the "codes" to his credit cards.  Ratliff stated that he gave the man his wallet

4

and told him that he did not have any "codes." Ratliff testified that after he complied with the robber's demand to lie face down on the ground, Ratliff heard the man run away. Ratliff identified Scott at trial as his assailant.

Holly L. Narducci testified about an incident that occurred between 7:30 p.m. and 8:30 p.m. on May 2, 2003. Narducci related that she was sitting in her garage, with the garage door open, when a black man entered the garage and said, "Scream, and I'll kill you." Narducci stated that the man pointed a gun at her head and demanded a wallet lying on a nearby workbench. Narducci testified that after she gave the man a credit card from the wallet, the man demanded a PIN. According to Narducci, she told the man the card did not have a PIN. As she "grabbed for" the man's gun, he ran away. Narducci identified Scott as the robber in a photographic lineup and at trial.

Next, Aderonke Aderonmu testified that she was driving home from work about 12:30 a.m. on May 15, 2003, when she noticed that a vehicle appeared to be following her car. Aderonmu stated that she saw the vehicle stop near her neighbor's home and assumed that the driver was her neighbor. Aderonmu testified that after she parked her vehicle in the driveway of her residence, a black man approached her. He pointed a gun at her head and said, "Give me all the money or I blow your head." According to Aderonmu, she gave the man her purse, and the man

drove away in the vehicle that was parked near her neighbor's home. Aderonmu identified Scott in a photographic lineup and at trial as the man who robbed her.

Samuel K. Owens also testified, stating that he was robbed in the garage of his home at 9:30 p.m. on May 31, 2003. Owens testified that he was painting the inside of his garage, with the garage door open, when a black male ran into the garage and pointed a gun at Owens' head. According to Owens, the man asked for his wallet but Owens did not have his wallet with him. Owens stated that the man forced Owens, at gunpoint, inside the house to retrieve his wallet. Owens testified that after the man took his wallet and asked for Owens' PIN, Owens gave the man an incorrect PIN and the man left the house. Owens identified Scott as the perpetrator of the crime in both a photographic lineup and at trial.

Next, Jean Becker testified that she was robbed on the night of May 31, 2003. Becker stated that around 11:00 p.m., after she parked her vehicle in the driveway of her home, a black man appeared next to her vehicle. Becker stated that she tried to move to the other side of the vehicle to get away from the man but he reached into the vehicle, attempting to seize Becker's wallet. Becker testified that the man struggled with her and hit her in the mouth with a hard object that chipped her

tooth. The man next grabbed Becker's wallet and left. At trial, Becker identified Scott as her assailant.

Finally, the Commonwealth presented the testimony of Ian P. Goodwin, who described the details of the night he was robbed. Goodwin stated that on June 7, 2003, between 10:00 p.m. and 10:30 p.m., he left a friend's home. As Goodwin entered his vehicle that was parked on a street, a black male holding a gun approached the car and said, "Give me the keys to your car." Goodwin stated that he responded, "No," and began yelling for help. According to Goodwin, the man hit Goodwin several times with the gun while the two men engaged in a struggle. Goodwin testified that the man ultimately left the scene by driving away in a vehicle. After the incident, Goodwin discovered that his wallet had been taken. Goodwin was unable to identify his assailant.

Officer Michael A. Melnyk of the City of Virginia Beach Police testified that about one week after the Goodwin robbery, Melnyk initiated a traffic stop of Scott's vehicle for several apparent traffic violations. William Handlin, another police officer present during the traffic stop, testified that Scott, a black male, was ultimately arrested for driving with a suspended driver's license. Handlin stated that he found Goodwin's debit card in Scott's pants pocket.

Charles P. Primeaux, a City of Virginia Beach police officer who interviewed Scott after his arrest, testified that during an initial interview, Scott denied any involvement in the robberies. However, during a later interview, when Primeaux asked Scott why he committed robberies, Scott replied that he owed many people money. Primeaux also testified that when he asked Scott where he obtained the gun used in the robberies under investigation, Scott responded that he had purchased the gun in Portsmouth. Scott did not testify at trial.

The jury convicted Scott of seven counts of robbery, three counts of burglary, one count of abduction with the intent to extort money, one count of attempted extortion, and nine related counts of use of a firearm in the commission of a felony. The jury acquitted Scott of the two robbery counts and related firearm charges involving victims Holloway and Ratliff. The jury also acquitted Scott of the charges of attempted carjacking and use of a firearm, in which Goodwin was the victim. The circuit court sentenced Scott to a total of 253 years' imprisonment, in accordance with the jury verdict.

Scott appealed from the circuit court's judgment to the Court of Appeals, which held that the circuit court did not abuse its discretion in granting the Commonwealth's motion for a single trial of all the charged offenses. Scott v. Commonwealth, 48 Va. App. 401, 632 S.E.2d 12 (2006). The Court

of Appeals held that the nine robberies had "strikingly similar" characteristics and that, therefore, the circuit court reasonably concluded that the robberies were part of a "common scheme," within the meaning of Rule 3A:6(b).  Id. at 417, 632 S.E.2d at 20.  The Court of Appeals also held that the circuit court properly exercised its discretion in concluding that justice did not require separate trials under Rule 3A:10(c), because evidence of the other crimes would have been admissible in each individual trial to establish the identity of the criminal agent.  Id. at 417, 632 S.E.2d at 19.

On appeal to this Court, Scott argues that the Court of Appeals erred in affirming the circuit court's judgment. According to Scott, the Commonwealth failed to show that the offenses could be tried together under Rule 3A:10(c) as a "common scheme or plan," within the meaning of Rule 3A:6(b). Scott further contends that the Commonwealth failed to establish that the robberies shared unusual characteristics, were linked to one another, were committed within a limited geographic area, or were committed to meet a single goal.

In response, the Commonwealth argues that reasonable inferences drawn from the evidence demonstrated a "pattern" among the robberies sufficient to satisfy the requirements of Rule 3A:6(b).  The Commonwealth contends that this "pattern" was established by the various shared characteristics of the crimes,

including that the robber targeted residents of Virginia Beach who were alone outside residential properties, and that the robber used a gun to carry out a "common purpose" of obtaining the victims' money, credit cards and, in several instances, their PINs. We disagree with the Commonwealth's arguments.

A circuit court's determination whether a defendant may be tried for multiple offenses in a single trial is a matter submitted to that court's sound discretion. Commonwealth v. Minor, 267 Va. 166, 172, 591 S.E.2d 61, 65 (2004); Commonwealth v. Smith, 263 Va. 13, 16, 557 S.E.2d 223, 225 (2002); Cheng v. Commonwealth, 240 Va. 26, 33–34, 393 S.E.2d 599, 603 (1990). Therefore, unless the circuit court abused its discretion in ordering a single trial for multiple offenses pending against a defendant, the circuit court's decision will be affirmed on appeal. Minor, 267 Va. at 172, 591 S.E.2d at 65; Smith, 263 Va. at 16, 557 S.E.2d at 225; Cheng, 240 Va. at 33–34, 393 S.E.2d at 603.

Under Rule 3A:10(c), when a defendant is charged with more than one offense, a court may order that the defendant be tried in a single trial "for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto." See also Satcher v. Commonwealth, 244 Va. 220, 229, 421 S.E.2d 821, 827 (1992);

10

Smith, 263 Va. at 16, 557 S.E.2d at 225; Cheng, 240 Va. at 33, 393 S.E.2d at 603.  Here, because Scott did not consent to be tried in a single trial for the pending offenses, the Commonwealth was required to establish both of the two other conditions of Rule 3A:10(c), namely, that the offenses satisfied the requirements of Rule 3A:6(b), and that justice did not require separate trials.

Under Rule 3A:6(b), two or more offenses may be joined in a single indictment "if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan."  See also Satcher, 244 Va. at 229, 421 S.E.2d at 827; Smith, 263 Va. at 16, 557 S.E.2d at 225.  Because the Commonwealth does not argue that the pending offenses were based on the same act or transaction or that they were "connected," within the meaning of Rule 3A:6(b), we limit our consideration of Rule 3A:6(b) to the Commonwealth's sole argument that the charged offenses were part of a "common scheme or plan," as contemplated by that Rule.

In deciding this issue, we first observe that we have not defined the term "common scheme or plan" in the context of Rule 3A:6(b).  However, in our decisions addressing the admissibility of evidence of other crimes in criminal trials, we often have applied the term in discussing pattern offenses or modus operandi.  For example, in Scates v. Commonwealth, 262 Va. 757,

11

553 S.E.2d 756 (2001), we held that evidence of similar offenses is admissible to prove a "common scheme, design, or plan," for purposes of establishing a defendant's identity, when those offenses exhibit "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." Id. at 762, 553 S.E.2d at 759 (quoting McWhorter v. Commonwealth, 191 Va. 857, 870–71, 63 S.E.2d 20, 26 (1951)). We also have stated that evidence of other crimes is admissible in cases of disputed identity to prove the probability of a common perpetrator, provided that the other crimes bear a "singular strong resemblance to the pattern of the offense charged" and are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." Turner v. Commonwealth, 259 Va. 645, 651, 529 S.E.2d 787, 791 (2000) (quoting Chichester v. Commonwealth, 248 Va. 311, 326–27, 448 S.E.2d 638, 649 (1994)); accord Spencer v. Commonwealth, 240 Va. 78, 89–90, 393 S.E.2d 609, 616–17 (1990).

With this discussion in mind, we define the terms "common scheme" and "common plan" for application in Rule 3A:6(b). Initially, we observe that the terms "common scheme" and "common plan" are not synonymous. The term "common scheme" describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed

12

by the same person or persons as part of a pattern of criminal activity involving certain identified crimes.  See e.g., Johnson v. Commonwealth, 259 Va. 654, 676–78, 529 S.E.2d 769, 782–83 (2000) (evidence of two other rapes admissible to prove identity of defendant in rape and capital murder case because crimes bore "strong resemblance" to one another, including that defendant knew all three black female victims, did not force entry into their dwellings, used steak knives obtained from victims' dwellings in attacks, and asked for glass of water or drank from glass in each dwelling); Turner, 259 Va. at 651–53, 529 S.E.2d at 790-92 (evidence of previous rapes and abductions admissible to prove defendant's identity when common idiosyncratic features included that defendant approached victims in shopping centers as they entered vehicles, asked for victims' names and addresses, ordered victims to look away from him, used weapon and threatened to kill victims, took car keys from each victim, and drove each victim away from scene where crimes committed); Spencer, 240 Va. at 81, 87–91, 393 S.E.2d at 611, 615–17 (evidence of "strikingly similar" offenses admissible to prove identity of defendant when common characteristics of offenses included entering bedrooms of victims through window, selecting victims who were caucasian women with similar body structures, committing offenses on weekends while on leave from half-way

13

house, and employing same type of strangulation for each victim).

In contrast, the term "common plan" describes crimes that are related to one another for the purpose of accomplishing a particular goal. See e.g., Powell v. Commonwealth, 267 Va. 107, 118, 140-41, 590 S.E.2d 537, 544, 557-58 (2004) (court did not err in admitting evidence of later rape and attempted murder to show identity and motive of defendant when letter written by defendant acknowledged his intent to rape and kill both victims, who were siblings); Collins v. Commonwealth, 226 Va. 223, 228-32, 307 S.E.2d 884, 888-90 (1983) (court did not err in admitting testimony of defendant's former prostitute employees because testimony showed defendant's intent to hire employees for purpose of operating prostitution business). The terms "common scheme" and "common plan," however, are not mutually exclusive and a series of crimes may exhibit both a "common scheme" and a "common plan." See e.g., Satcher, 244 Va. at 229-30, 421 S.E.2d at 827 (holding that similar crimes against two women in same location along bike path within 30 minutes of each other constituted parts of common scheme or plan to commit rape and robbery under Rule 3A:6(b)).

We disagree with the Court of Appeals' conclusion that the similarities in the present offenses sufficiently established the existence of a "common scheme." See Scott, 48 Va. App. at

14

413-15, 632 S.E.2d at 17-18. The Commonwealth proved only that during a period of about four months in the same large city, various individuals who were alone outside their homes were robbed during the late evening hours, and that the robber displayed a gun, usually threatening the victims with harm or actually striking them, and demanded from the victims money, credit cards and, in some cases, their PINs.

This evidence demonstrated only a general similarity of manner in which the crimes were committed and failed to establish that the crimes shared idiosyncratic features permitting an inference of a pattern of criminal activity committed by the same person. The fact that the robber in five of the present offenses demanded a PIN for the stolen credit cards was not an idiosyncratic feature, because it is common knowledge in our consumer society that such a number must be provided before making a cash withdrawal from an automated machine.

The absence of idiosyncratic features in the present record leaves a record showing only separate crimes of the same type that share features that are likely similar to numerous other robbery offenses. Notably, the present record does not indicate the relative location of each robbery to the other robberies committed, and thus fails to show that the robberies were committed in any particular neighborhood or area of this large

15

city.  The record also fails to show that a weapon of the same description was used in the commission of the crimes, that the robber made unusual threatening remarks, or that the robber chose victims only of a certain gender or age group.  We cite these various factors, not as requirements of a "common scheme," but merely to illustrate that the possible range of idiosyncratic features that may establish a "common scheme" is very broad, and that no such idiosyncratic features were common incidents of all the present offenses.[2]

We further note that the Court of Appeals did not address whether the offenses pending against Scott constituted part of a "common plan."  However, because the Commonwealth argues that the offenses were part of a "common scheme or plan," we also consider whether the evidence demonstrated the existence of a "common plan."  We conclude that the evidence did not establish the existence of such a plan.  As we have observed, the evidence showed only the commission of nine robberies and other related offenses bearing a general similarity to one another.  Moreover, the evidence completely lacked any proof that the offenses were related to one another for the purpose of accomplishing a particular goal.

---

[2] As we have already indicated, while the victims in four of the robberies identified Scott as their assailant, the victims in the other five robberies were unable to do so.

16

Accordingly, we hold that because the Commonwealth failed to establish that the offenses pending against Scott constituted parts of a "common scheme or plan," within the meaning of Rule 3A:6(b), the Court of Appeals erred in approving the circuit court's discretionary decision ordering a single trial under the provisions of Rule 3A:10(c). Also, having concluded that the Commonwealth failed to establish a required element of Rule 3A:10(c), namely, compliance with Rule 3A:6(b), we do not reach the separate issue under Rule 3A:10(c) whether justice required separate trials.

For these reasons, we will reverse the judgment of the Court of Appeals affirming Scott's convictions, and will remand the case to the Court of Appeals with direction that the case be remanded to the circuit court for new trials if the Commonwealth be so advised.

<u>Reversed and remanded</u>.