# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Charles Stanard Severance

## Case No. FE-2015-430

June 22, 2015

By Judge Jane Marum Roush

This matter came before the Court on April 23, 2015, for a hearing on the Defendant's Motion To Sever and the Commonwealth's Memorandum in Opposition to Defendant's Motion To Sever. At that time, I took the motion under advisement. I have since fully considered the motion, the opposition, and the arguments of counsel. For the reasons stated below, the Motion To Sever will be denied.

## I. *Background*

Charles S. Severance was indicted on September 8, 2014, in the Circuit Court of the City of Alexandria. Venue was subsequently changed to Fairfax County by an order entered on April 23, 2015. The indictment consists of the following counts: Count 1: Capital murder of Ruthanne Lodato on February 6, 2014; Count 2: Use of a firearm while committing murder on February 6, 2014, a second or subsequent offense; Count 3: Malicious wounding of J.F. on February 6, 2014; Count 4: Use of a firearm while committing malicious wounding on February 6, 2014, a second or subsequent offense; Count 5: Capital murder of Ronald Kirby on November 11, 2013; Count 6: Use of a firearm while committing murder on November 11, 2013, a second or subsequent offense; Count 7: First degree murder of Nancy Dunning on December 5, 2003; Count 8: Use of a firearm while committing murder on December 5, 2003; Count 9: Possession of a firearm by a convicted felon on February 6, 2014; and Count 10: Possession of a firearm by a convicted

24

felon on November 11, 2013. Counts 7 and 8 will be referred to collectively as the "2003 Charges." Counts 5, 6, and 10 will be referred to as the "2013 Charges." Counts 1, 2, 3, 4, and 9 will be referred to as the "2014 Charges."

The Commonwealth has declared in writing that it will not seek the death penalty for either of the capital murder charges.

In his Motion To Sever, the Defendant requests that Counts 7 and 8, relating to the murder of Nancy Dunning on December 5, 2003, be severed from the remaining counts and that he be granted a separate trial on those charges.

## II. *Discussion of Authority*

### *Rules of the Supreme Court of Virginia*

Rule 3A:10 of the Rules of the Supreme Court of Virginia provides, in pertinent part:

> (c) *An Accused Charged with More Than One Offense.* The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's Attorney consent thereto.

Rule 3A:6(b) provides:

> (b) *Joinder of Offenses.* Two or more offenses, any of which may be a misdemeanor, may be charged in separate counts of an indictment or information if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan.

Summarizing, unless justice requires separate trials, offenses may be joined for trial over the objection of the Commonwealth or the accused if the offenses are: (1) based on the same act or transaction, (2) multiple acts that are connected, (3) multiple acts that are parts of a common scheme, or (4) multiple acts that are parts of a common plan.

In his Motion To Sever, the Defendant argues that the 2003 Charges are not "based on the same act or transaction" as the 2013 Charges or the 2014 Charges, nor are the 2003 Charges "part of a common scheme or plan" together with the 2013 Charges or the 2014 Charges. Further, the Defendant contends justice requires a separate trial on the 2003 Charges.

The Commonwealth responds that all of the charges in this case are "connected," part of a "common scheme," and part of a "common plan" within the meaning of Rules 3A:10(c) and 3A:6(b). The Commonwealth maintains that justice does not require separate trials.

*Case Law*

The Court will not address the "same act or transaction" prong of Rule 3A:6(b) because the Commonwealth makes no argument that the 2003 Charges are part of the "same act or transaction" as the 2013 Charges and the 2014 Charges.

## A. *Multiple Acts That Are Connected*

To be "connected" for the purposes of Rules 3A:10(c) and 3A:6(b), "two or more crimes . . . must be so intimately connected and blended with the main facts adduced in evidence that they cannot be departed from with propriety." *Commonwealth v. Smith*, 263 Va. 13, 17, 557 S.E.2d 223 (2002), quoting *Kirkpatrick v. Commonwealth,* 211 Va. 269, 273, 176 S.E.2d 802 (1970) (internal quotation marks omitted).

The abstruse phrase that the offenses must be "so intimately connected and blended with the main facts adduced in evidence that they cannot be departed from with propriety" is first found in *Walker v. Commonwealth*, 28 Va. (1 Leigh) 574 (1829). That case did not, however, involve a joint trial for two offenses. Rather, the issue was whether, in Walker's prosecution for stealing a watch, evidence was admissible that he had once stolen a coat.

Federal Rule of Criminal Procedure 8(a) is similar to Rule 3A:6(b). The federal rule provides:

> (a) *Joinder of Offenses*. The indictment or information may charge a defendant In separate counts with two or more offenses if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).

In interpreting that rule, "federal courts ask whether commission of one of the offenses either depended upon or necessarily led to the commission of the other." *Walker v. Commonwealth*, 289 Va. 410, 418, 770 S.E.2d 197, 200 (2015) (internal ellipses and alterations omitted).

## B. *Multiple Acts That Are Part of a Common Scheme*

A "common scheme" means "a particular act done multiple times in a similar way." *Walker,* 770 S.E.2d at 200, n. 4.

If the similarity between the offenses is sufficiently distinctive, this is consistent with our definition in *Scott* that the term "common scheme" describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same

person or persons as part of a pattern of criminal activity involving certain identified crimes.

*Id.*, citing *Scott v. Commonwealth*, 274 Va. 636, 651 S.E.2d 630 (2007) (internal alterations omitted).

## C. *Multiple Acts That Are Part of a Common Plan*

In *Scott v. Commonwealth*, 274 Va. 636, 651 S.E.2d 630 (2007), the Supreme Court of Virginia held that "the term 'common plan' describes crimes that are related to one another for the purpose of accomplishing a particular goal." *Id.* at 646.

In the recent case of *Walker*, the Court reversed the lower courts' holding that the defendant's four charges of drug distribution were properly joined for a single trial because they were part of a common plan. The *Walker* court quoted with approval the case of *Spence v. Commonwealth*, 12 Va. App. 1040, 1044, 407 S.E.2d 916 (1991), in which it was held that a common plan was one "that tied the offenses together and demonstrated that the object of each offense was to contribute to the achievement of a goal that was not obtainable by the commission of any of the individual offenses."

Attempting to clarify the "amorphous" term "common plan," the Court in *Walker* reasoned:

> Thus, a "common plan" connotes a series of acts done with a relatively specific goal or outcome in mind. This goal or outcome exists when the constituent offenses occur sequentially or interdependently or advance some common, extrinsic objective. For example, a defendant may break into a bank president's home, steal the keys to the bank, and then burgle it. All of the associated offenses are committed sequentially to further the principal objective of taking the money from the bank. Similarly, a defendant may be a partner in a business and murder the other partners to acquire control of it. Each murder is a separate prerequisite to acquiring control of the business, so each offense is an act in furtherance of that objective.

*Walker*, 770 S.E.2d at 200-01, quoting David P. Leonard, *The New Wigmore: A Treatise on Evidence,* "Evidence of Other Misconduct and Similar Events," §§ 9.2.1 and 9.2.2 (2009) (internal citations omitted).

## D. *The Requirements of Justice*

The "justice" prong of Rule 3A:10(c) requires an analysis of whether evidence of one crime would be inadmissible as unduly prejudicial in the prosecution of a second crime. *Commonwealth v. Minor*, 267 Va. 166, 591 S.E.2d 61 (2004). Justice "requires separate trials where highly prejudicial

evidence of one of the crimes is not admissible in the trial of the other." *Long v. Commonwealth*, 20 Va. App. 223, 226, 456 S.E.2d 138 (1995).

In *Minor*, the Supreme Court held that, where identity of the perpetrator was not at issue, justice required that the accused have separate trials on two rape charges. The only issue in Minor's prosecution was the consent of the alleged victims. The Court reasoned that "evidence showing that a defendant raped one or more individuals other than the victim in the crime charged is generally not relevant to the question whether that victim did or did not consent to sexual intercourse with the defendant." The Court distinguished the case of *Satcher v. Commonwealth*, 244 Va. 220, 421 S.E.2d 821 (1992), where identity of the perpetrator was disputed and evidence of an earlier sexual assault was admissible in the prosecution for rape and murder of a second victim to prove identity.

Virginia Rule of Evidence 2:404(b) governs when "other crimes" evidence is admissible:

> Evidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith. However, if the legitimate probative value of such proof outweighs its incidental prejudice, such evidence is admissible if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.

Va. R. Evid. 2:404(b).

III. *The Commonwealth's Theory of Its Case*

The Court must review the Commonwealth's expected evidence in order to determine if the 2003 Charges are connected to or part of a common scheme or plan with the 2013 and 2014 Charges and also to determine if justice requires separate trials.

A. *Connected*

The Commonwealth argues that the 2003 Charges are "connected" to the 2013 Charges and the 2014 Charges because the jury will be asked to compare known images of the Defendant in 2003 with a videotape showing a man who appeared to be following Ms. Dunning in a Target store about an hour before she was murdered. Further, the jury will be asked to compare a police artist's sketch created based on the recollection of an eyewitness to the Lodato murder in 2014 with the Defendant's present appearance. According to the Commonwealth, "[b]ecause part of the government's proof is comparing images of the asserted killer at two vastly different points in

time and in two cases and asking the jury to compare them against known images of the defendant at the same time, there is interlocking evidence between the crimes" and the offenses are, therefore, "connected" within the meaning of Rule 3A:6(b).

### B. *Common Scheme*

At the April 23, 2015, hearing on the Defendant's Motion To Sever, the Commonwealth's Attorney outlined the Commonwealth's evidence of a "common scheme" as follows. Transcript (partial) of April 23, 2015, hearing at pp. 22-40. The Court stresses that what follows is the Commonwealth's proffer of what it expects its evidence at trial to be, not any findings of fact by the Court.

All of the offenses charged in the indictment occurred within approximately one mile of one another in the same general neighborhood. The neighborhood is considered a low-crime area of the City of Alexandria. All of the offenses occurred on a weekday, in the late morning. All of them occurred when the victim answered a knock on the door of his or her residence. The victims were all shot in the foyers of their houses. Nothing was stolen in any of the cases. The houses were not rummaged through or ransacked. Other than being shot, no victim was sexually assaulted or touched in any way. The Commonwealth asserts, "[i]n other words, the killer, apparently, knocked, perhaps talked, briefly entered, killed, and exited."

Nancy Dunning, the victim in the 2003 Charges, was shot with .22 caliber bullets manufactured by Remington. Three bullets were recovered from her body. The bullets were either the "Cyclone" or "Subsonic" models. That type of ammunition is low velocity and designed to make less sound when fired. The bullets had eight lands and grooves and a twist to the right. The bullets appear to have been fired from the same firearm, which was a revolver. The Commonwealth's Attorney explained that: "Firearms examiners . . . [examine] impressions imparted on the soft lead of a bullet as it travels down the barrel of a firearm after firing. Most firearms are rifled, meaning that a series of grooves inside of the barrel imparts spin to the bullet and improves its accuracy. These grooves leave a number of marks called lands and grooves on the bullet, and, additionally, the lands and grooves twist to either the right of left, depending on the firearm."

In 2013, Ronald Kirby was shot with Remington .22 caliber ammunition, either Cyclone or Subsonic. The gun used to kill Mr. Kirby was similar, but not identical, to the gun used to kill Ms. Dunning. Five bullets were recovered, either from Mr. Kirby or the crime scene.

Ruthanne Lodato was shot in 2014 with Remington .22 caliber ammunition, either Cyclone or Subsonic. Five bullets were recovered, either from Ms. Lodato or the crime scene. The gun used to kill Ms. Lodato was very similar, but not the same gun used to kill either Ms. Dunning or Mr.

Kirby. According to the Commonwealth, "the firearms evidence establishes that three very similar firearms using the same type of ammunition were used in the murders."

Two firearms experts from the Department of Forensic Science, who, between them, have sixty-five years of experience, "would testify that, in their entire careers, the only offenses in which they have observed this type of ammunition used in a crime, any crime, let alone murder, are these three offenses that occurred within approximately one mile of one another in a low crime neighborhood of Alexandria." Low velocity rounds make less sound than higher velocity rounds and, "therefore, can be used . . . to kill somebody without neighbors, or passersby, hearing."

In April 2003, eight months before the murder of Ms. Dunning, the Defendant purchased a .22 caliber North American Arms five-shot mini-revolver. That firearm is capable of firing .22 caliber Remington Cyclone or Subsonic ammunition. In February 2004, two months after the Dunning murder, that gun was seized from the Defendant during a traffic stop in Harrisonburg, Virginia. The Defendant was convicted of a felony and thereafter was prohibited from possessing or purchasing firearms. The gun seized in Harrisonburg was later destroyed by court order.

After his conviction in Harrisonburg, the Defendant spent several years traveling throughout the United States. He returned to Virginia and met a woman with whom he lived in Ashburn. At the Defendant's urging, his girlfriend purchased two North American Arms five-shot mini revolvers, one in May 2012 and the other in August 2012. The Defendant accompanied his girlfriend to a local gun shop in order to purchase ammunition for the guns. She purchased .22 caliber ammunition. "She does not remember the manufacturer's name, but she remembers it came in a green and white box, which is the design of Remington ammunition." She recalls that the Defendant emphatically wanted "low velocity ammunition only."

In March 2014, after the Defendant learned that the police wanted to speak to him, he left his girlfriend's house. She discovered that the two .22 caliber North American Arms five-shot mini revolvers were gone from her house, although two other, larger caliber guns that she owned before meeting the Defendant remained.

Search warrants were executed for the Defendant's parents' house in Fairfax County, where the Defendant sometimes stayed. A box of .22 caliber Subsonic low-velocity ammunition "perfectly matching the firearms evidence" was recovered in the area where the Defendant kept his belongings. The fifty-round box contained forty rounds of unfired ammunition, suggesting that ten rounds were missing. The Defendants' parents stated that it was not their ammunition.

A search warrant was executed at the Defendant's girlfriend's house in Ashburn. Two spent cartridge cases of Remington .22 caliber ammunition were recovered. The girlfriend said she had never fired the guns and had

no idea how these cartridge cases ended up in her house. The forensic scientists determined that these rounds were consistent with either Cyclone or Subsonic ammunition and likely had been fired through a North American Arms .22 caliber revolver.

Summarizing the firearms evidence, the Commonwealth states: "The firearms evidence shows a killer who used three different, but extremely similar firearms, with eight lands and grooves and a right twist and was partial to .22 caliber Remington ammunition, either Cyclone or Subsonic, low velocity. The evidence shows that the Defendant possessed three different, but extremely similar firearms, with eight lands and grooves and a right twist and was partial to .22 caliber Remington Subsonic ammunition."

In the Commonwealth's view, "[t]he fact that [the Defendant] possessed these guns and was [fixated] on the appropriate ammunition at the appropriate times is evidence that he committed all three murders."

The Defendant is also tied to the firearm evidence by his writings found in his automobile at the time of his arrest and recovered from his girlfriend's house. "In his own handwriting and on an internet printout of the gun, the Defendant lists the gun, a gun cleaning kit, and specifically writes 'one box of .22 caliber low velocity subsonic ammunition.' On another piece of paper, after writing the serial number of one of the guns, he writes 'NAA .22 caliber long rifle mini revolver, hammer interferes with the left side, frame track does not clear both sides of track.' In other words, in his own handwriting, the Defendant is describing the mechanical issue he had discovered on the gun while firing it."

Also found in the Defendant's writings:

> Please purchase three North American Arms .22 caliber MINI revolvers and 500 rounds of low velocity subsonic cartridges. The five-round stainless steel with a wooden grip is small and easily concealed. Thou shalt murder and vengeance is mine saith the Lord. Hollow point and below the speed of sound is sweet music and very very effective in the very dangerous land of Allah. . . .
>
> The guns should never have fired medium velocity, or higher velocity, .22 cartridges, only .22 caliber low velocity subsonic ammunition. On the street or in a hollow, the gun is called a Mormon death squad.
>
> North American Firearms out of Utah makes a beautiful, tiny, and deadly .22 caliber mini revolver 5 cartrage [sic] stainless steel mormon [sic] death squad special. Best to discharge subsonic less than the speed of sound ammunition. Don't damage the gun with high velocity high energy rounds.

> Aversion and appetite govern men. Aversion to jail and appetite to kill an adversary.

The Commonwealth concludes its discussion of its evidence of a "common scheme" by arguing that "[t]hese offenses are signature crimes and it is the Defendant's signature etched upon them. The method, location, time of day, gun and ammunition evidence, all establish that the offenses are idiosyncratic signature crimes and, therefore, connected."

### C. *Common Plan*

The Commonwealth argues that there is ample evidence of a "common plan" within the meaning of Rule 3A:6(b). According to the Commonwealth's proffer of what it expects its evidence at trial to be. Transcript (partial) of April 23, 2015, hearing at pp. 40-52.

The Defendant lived in Alexandria in the late 1990s through the early 2000s. He lived in Park Fairfax, within one-half mile of Ms. Lodato's house and in the same general neighborhood as all three murders. The Defendant was well-known in political circles, which he would later call part of the "nefarious utopian elites." He ran "quixotic" campaigns for mayor of Alexandria.

While an Alexandria resident, the Defendant fathered a child with a woman with whom he lived. After the birth of the child, he and the mother separated. A contentious and prolonged custody case ensued in the Alexandria courts. The mother was granted sole custody, and the Defendant never again saw his child. The court's custody decision caused extreme anger in the Defendant. According to the Commonwealth, "[w]itnesses have recounted that, years [after] the decision, the Defendant, occasionally, would go on irrational tirades about the custody decision, blaming the City of Alexandria, the courts, and elected officials, for kidnapping his child. Witnesses were frightened and concerned by the intensity of the anger he displayed, even as late as 2013."

As the ten-year anniversary of Ms. Dunning's murder approached, the Defendant's motive "mutated slightly away from a hatred just of the court system and more to 'the nefarious utopian elites'."

The Commonwealth proffers that "[w]ritings in this case, in the Defendant's own hand, and which can be dated to as late as the fall of 2013, one month before Ron Kirby's murder, bear out his intense anger and an internal debate about whether murder was justified." The Defendant wrote I "received no satisfaction after revenge killing." He concluded that "Murder is good. Court justice is bad. Can you forgive someone for kidnapping your son? Can you murder someone for kidnapping your son?"

Other writings of the Defendant on this topic include:

Thou shalt not kill is a lie. No self-respecting god-fearing patriarch would not kill men and women who delight in terrorizing his family.

A man who becomes victim of Child Protective Services, or Family Court, or other government kidnapping agencies, is at liberty until he is effectively fatigued from finding no satisfaction.

Suffering father's scheme is rife with murder and grief, exempt from all measures of the enforcement class. Murder on my mind and my mind on murder. Thou shalt murder saith the Lord.

Attachments to government cease to be natural when they cease to be mutual.

It is not he who dies with the most toys wins, or lives the longer. He who denies the most years of life to his adversaries wins.

Thou shalt murder kill assassinate slay execute.

Vengence [sic] is mine saith the Lord.

The last scream of a victim echoes to eternity.

Give glory to God. Peace on earth. Death to adversaries.

It has nothing to do with business, everything is personal.

They kidnap and they die.

Violent change or revolution is necessary to rein in the excesses of government law and order. Effective coercion on all beneficiaries of a government that failed to protect. Innocents died on the cross 2000 years ago; the guilty is all that is left.

Let all members of the enforcement class scream.

Elites are always driven by selfish motives. Murder elites. My liberty and your oppression are the order of the day.

Violence is the last vacation resort for ambitious victims. The reward is denying pleasure to others, especially members of the law enforcement class and nefarious utopian elites.

The first law of Noble Savage Theory is thou shalt murder. The second law of Noble Savage Theory is thou shalt murder again and the third again and again.

Great patriarchs teach their children how to murder thy neighbor and the happy good mother of his children submits.

Violence on Utopians is the new world law and order. Reverse role and become the enforcement class only by violent means, violent change, violent regime change, violent negotiations, violent policy, violent actions, violent words, violent behavior, and above all violence. The opperative [sic] word is violence. Violence wins.

Introduce murder into a safe & secure neighborhood. It shudders with horror. Do it again and again and again. . . . Add violence and increase uncertainty among *status quo* utopian oppressive elites. Emotionally disturb them with violence. Nightmares and day dreams of terror. Horrible child trolls the neighborhood.

I've been nudging and trolling for over a decade and nobody has noticed violence wins assassinate because it is in the best interest of the child.

The Defendant wrote a poem, entitled "Parable of the Knocker." It reads:
Knock Enter
A metaphor A translation A mystery
Knock and the door will be answered
Seek and ye shall find
Knock and the door will open
Ask and ye shall know
Wisdom
Knock Talk Enter Kill Exit
Murder Wisdom
Patience is an excuse for cowardice
Jesus is the Lord

Summarizing its evidence of a "common plan" the Commonwealth asserts that the Defendant "definitely believed that . . . he had been wronged by what he termed the law enforcement class, and that he, therefore, had the right to murder and assassinate." The "common plan," according to the Commonwealth, was the Defendant's plan to exact revenge on the "enforcement class" of Alexandria who kidnapped his child. Each of the victims has been described as a prominent Alexandrian. Ms. Dunning was

a real estate agent and the sheriff's wife. Mr. Kirby was a transportation planner. Ms. Lodato was a music teacher and the daughter and sister of a judge. The ten-year gap between the murder of Ms. Dunning in 2003 and the murder of Mr. Kirby in 2013 can be explained, according to the Commonwealth, by the seizure of the Defendant's firearm in 2004, and his inability to purchase firearms following his felony conviction in Harrisonburg in 2004 until he was able to persuade his girlfriend to purchase two guns for him in 2013.

## Conclusion

Having carefully considered the Commonwealth's proffer of evidence as outlined above, the Court concludes that the Motion To Sever should be denied.

The Court finds that the 2003 Charges are not "connected" with the 2013 Charges or the 2014 Charges as that term is used in Rule 3A:6(b). The Court does not agree with the Commonwealth that the "interlocking evidence" of the various images of the Defendant over the years, the images of the man in the Target video, and the police artist's sketch from 2014 make the offenses "connected" under Rule 3A:6(b).

The two capital murder charges (*i.e.,* the murder of Mr. Kirby in 2013 and the murder of Ms. Lodato in 2014) are "connected" because one is the predicate offense for the other. It is the murder of Mr. Kirby and Ms. Lodato within a three-year period which elevates the offenses to capital murder under Va. Code § 18.2-31(8). *See Commonwealth v. Smith,* 263 Va. 13, 557 S.E.2d 223 (2002) (Va. Code § 18.2-31(8) supplies the connection to satisfy the requirement for joinder).

The Commonwealth's evidence, if proven at trial, would satisfy the "common scheme" prong of the test for joinder under Rule 3A:6(b). The offenses are sufficiently "idiosyncratic in character [to] permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain, identified crimes." *Walker,* 770 S.E.2d at 200, n. 4.

Similarly, the Commonwealth's evidence, if proven at trial, would satisfy the "common plan" test for joinder under Rule 3A:6(b). The offenses constitute "a series of acts done with a relatively specific goal or outcome in mind." The "constituent offenses [occurred] sequentially or interdependently or [advanced] some common, extrinsic objective." *Id.* at 200-01. The Commonwealth's proffered evidence suggests that the Defendant's common plan was to exact revenge on the elites of the City of Alexandria because of his deep anger over his loss of the custody of his child.

Furthermore, justice does not require separate trials because evidence of the 2003 offenses will be admissible in the trial of the other offenses under Rule of Evidence 2:404(b), in that "it tends to prove any relevant fact

pertaining to the offense charged, such as . . . motive, . . . intent, preparation, plan, knowledge, [and] identity." Additionally, evidence of the other crimes is admissible under Rule of Evidence 2:404(b) because "they are part of a common scheme or plan."

## Order

This matter came before the Court on April 23, 2015, on the Defendant's Motion To Sever. At that time, the Court took the motion under advisement. For the reasons stated in the Court's opinion letter dated today, the Motion To Sever is denied.

## January 21, 2016

BY JUDGE RANDY I. BELLOWS

Charles Severance is before the Court today to be sentenced following the jury's verdict finding him guilty on ten felony counts, including two counts of Capital Murder and one count of First Degree Murder.

This Court presided over the trial of this matter and heard all the evidence adduced at trial. This Court also listened carefully to the testimony of each of the family members who testified during the sentencing phase of the case. These were Gregory Giammittorio, Lucia Lodato, Norman Lodato, Molly Kirby, Ann Haynes, Marilyn Kirby, Patty Moran, and Elizabeth Dunning.

The Court has carefully reviewed the Presentence Report, including the Victim Impact Statements submitted by ten individuals. These statements were all from family members of the Dunning, Kirby, and Lodato families.

Upon entry of the Court's sentencing order following today's hearing and in accordance with Virginia Code § 19.2-299.1, the Victim Impact Statements will be placed under seal. Victim Impact Statements are submitted before sentencing, however, so that they "may be considered by the court in determining the appropriate sentence."

Among other matters, family members of homicide victims are permitted by statute to "identify the nature and extent of any physical or psychological injury suffered by the victim as a result of the offense" and to "detail any change in the victim's personal welfare, lifestyle, or familial relationship as a result of the offense." This they have done, and what the Court takes away from these Victim Impact Statements, and all the other materials in the Court's possession, is the following.

Charles Severance, by his willful, intentional, deliberate, premeditated, malicious, and cruel conduct, shattered the lives of these three families. They will never, ever, recover from what he did.

Charles Severance stole a mother from the son and daughter of Nancy Dunning and he stole another mother from the three daughters of Ruthanne Lodato. He stole a father from the son and daughter of Ronald Kirby. Seven

sons and daughters he did this to. As one of those daughters wrote in her Victim Impact Statement, "There is no way to put into words how much the loss of my Mom has altered my life. It is a void that will never be filled. I think about my Mom each and every day. And I feel sad every single day that she is gone."

Charles Severance stole from brothers and sisters their beloved brother and sisters. He stole from two husbands their wives, and he stole from one wife her husband. "We had talked about growing old together," wrote one family member, "Now I grow old alone."

And there is more. Charles Severance stole a daughter from her elderly mother, and he murdered that daughter while her mother was in the next room. According to one family member, Mrs. Lodato's mother "never recovered from the loss of her daughter."

Charles Severance stole from nephews and nieces and cousins and neighbors and friends, and the Alexandria community, three people they loved, admired, valued, and respected. Each was a pillar of their community, and their murders — as he obviously intended — sent shockwaves of grief and terror throughout the community.

And these shockwaves, as one family member put it, were "not like the rings spreading from a pebble thrown into quiet water, but like the concussive waves of a bomb blast."

They reached not only to every corner of Alexandria — not only to the city's residents afraid to open their doors, and not only to the generations of children who came to love music because they had Ruthanne Lodato as their teacher, and now had to learn a lesson of a very different sort — but these shockwaves also reached to relatives throughout the United States and indeed the world, whose lives were changed instantaneously and forever by a phone call with news so incomprehensible that it was like, as one family member wrote, "a sudden tear in reality."

Across one ocean, in England, a daughter of Ruthanne Lodato — just twenty years old and doing a semester abroad — learned to her horror of her mother's murder. She had been pulled out of line at Customs and told she needed to call home and it was important. She describes the "terrible feeling" in her stomach and the certainty that "something had gone terribly wrong." Moments later, she learned of her mother's murder. She writes: "I howled and sobbed in the airport." Charles Severance did this.

Across another ocean, in Australia, the brother and sister of Ron Kirby were told of their older brother's death and were distraught. They had what the brother called the "heartbreaking" task of gathering together the effects of Ron Kirby's life in Australia, including photos of Ron as a young boy, "looking so earnest and so innocent of the world. . . ." Both brother and sister, when writing of their loss, focused on the fact that now they would never be able to see their brother again. Mr. Kirby's sister writes "[We] were all reaching the age where we would have had more free time to meet

and talk about our lives and what we had seen and what we had learned in the years we had been apart. We will forever miss hearing Ron's stories and spending that precious time with him and it is all because of a senseless and malicious act." Charles Severance did this too.

And still there was more. Charles Severance chose to murder these three individuals in their own homes. That decision was, itself, an act of surpassing cruelty. He turned the one place that should be the safest and the most secure of sanctuaries into an abattoir of horror, the place where loved ones were slaughtered. Even worse, by killing them in their own homes, he made it certain and inevitable that their blood-soaked and bullet-riddled bodies would be discovered by their own family members: in the case of Nancy Dunning by her son, Chris, and her husband, Jim, and in the case of Ronald Kirby, by his son, Josef.

No son or daughter, no husband or wife, should ever have to face what Chris Dunning and Jim Dunning had to face on December 5, 2003, and what Josef Kirby had to face a decade later, on November 11, 2013. Trials of this nature — complex criminal trials that rely substantially on forensic evidence — necessarily focus on the dry and dispassionate language of science, on the tools of technology and analysis, and on the methodology of crime scene investigation. It is how criminal cases are proven, and it is how this case, at least in part, was proven. But none of it — not the hundreds of exhibits, or the scientific reports, or the certificates of analysis, or the expert testimony, or the diagrams and sketches and crime scene measurements, or the fingerprint analyses, or the DNA testing, or the autopsy reports, or the firearms examinations, or the documents establishing chains of custody — none of it, should distract anyone from the evidence that concerned the awful and agonizing moment when Nancy Dunning and Ron Kirby were discovered dead in their homes. To understand this point one need only to listen to Chris and Jim Dunning's 911 call.

For this too, Charles Severance is responsible. He condemned each of these family members to bear witness to a nightmare — except, of course, this nightmare was real; this nightmare they could not wake from, and this nightmare got replayed again and again in what one family member called "flashbacks to the horror."

At the Lodato home, the only thing that prevented Norman Lodato from being yet another family member to discover a gravely wounded loved one was the presence and intervention of Janet Dorcas Franko, Mrs. Lodato's mother's caregiver. When Ms. Franko came face to face with the murderer of Ruthanne Lodato, Charles Severance shot her, but she did not die. Instead, she would become the sole survivor, and would identify Charles Severance at this trial as her assailant. But that was still two years into the future. What she did immediately was to summon help and then, in an act of astonishing courage, this wounded woman went back into the house in an

effort to render assistance, not even knowing if the killer was still present. Unfortunately, Mrs. Lodato could not be saved.

The impact on the lives of these family members was catastrophic and permanent and — as is clear from these victim impact statements — it is a trauma they wake up to every single day. Again and again, the Court reads in these statements expressions of such pain and such grief: "We are learning to suffer"; the "pain and loss will never subside"; it is a "deep, deep, deep pain"; it is an "unfathomable depth of pain"; "it is a void that will never be filled"; and "my life . . . is devastated."

They have written of the depression and anxiety and physical ailments that these crimes inflicted upon them. They have written that Charles Severance's crimes have shaken their faith in humanity — one family member wrote "I have sometimes wondered whether evil exists in the world. . . . I no longer wonder" — and have even shaken their faith in their faith. They have written that they no longer feel safe in their homes. They have described the "quick flash of fear" and the torment they experience every time there is a knock at the door. They have written of big events in their lives — college graduations, new homes, new jobs, weddings — events that should have been full of joy but, instead, became stark reminders of what they have lost. As one family member wrote "I will continue to feel sad, with every happy thing that happens in my life, because my Mom is not here to celebrate it with me."

And, finally, and perhaps most sadly, they have written of their profound sorrow knowing that their children will never get to meet and be adored by the grandparents Charles Severance chose to murder. As one family member wrote: "I know that my mom could not wait to become a grandmother. It breaks my heart to think about how happy she would be holding her grandson." Said another family member: "It breaks my heart that all I can do is imagine the way she would know and love and support them. . . ." But, she writes, "they will never know her. And nothing that you could do or recommend with your sentencing will bring her back."

There is also great bravery in these victim impact statements. As one family member wrote of Charles Severance: "You have not defeated us." These family members express their determination not to have the memories of their loved ones defined by these cold-blooded killings, that some how and some day they will emerge from what one victim described as the "darkness" he inflicted upon them and they will be able to remember their parents, their siblings and their spouses with warmth, affection, and joy, and not by how they died. Yet they know, as they have written in their statements, that the "hole in our hearts remain" and that they must somehow figure out how to live with this "horrible void." "Most days," wrote one family member, "I feel like I will never be 'happy' again."

No one reading these statements could possibly conclude that the passage of time will do much to dull this pain. It is, as one member of

the Dunning family wrote, a "loss and grief that we still feel every day — almost twelve years later." It is, as one member of the Lodato family wrote, something that "no amount of time" will fix; "[t]he pain and loss will never subside. . . ." It is, as one member of the Kirby family wrote, an impact they will suffer for the rest of their lives.

Finally, we come to the direct impact of Charles Severance's crimes on the victims themselves. When he murdered Nancy Dunning, Ruthanne Lodato, and Ronald Kirby, Charles Severance deprived them of their natural right to live out their lives as they saw fit. He cheated them of the opportunity to grow old, as one family member said of Ruthanne Lodato, "she was supposed to" grow old "with my Dad." Charles Severance robbed Mrs. Dunning, Mr. Kirby, and Mrs. Lodato of the pleasure of sharing the remainder of their lives with the people they loved and the people that loved them.

There is no knowing, of course, what the future might have had in store for them, how many years or decades they might have lived, but this much is known for certain: Nancy Dunning was just 56, Ruthanne Lodato just 59, and Ron Kirby still in his 60s, when Charles Severance took it upon himself to make certain that none of them would ever experience another second of joy. These victim impact statements make it utterly clear that Nancy Dunning, Ruthanne Lodato, and Ronald Kirby were each fully and deeply engaged in their communities, in their work and, most of all, in their families. Life was not in the rear view mirror for any of them — not until the very moment when Charles Severance did what no man has the right to do: he decided that these three vibrant human beings were done living. . . .

The Court has given Charles Severance the opportunity to make a statement before sentencing, and the Court has given both counsel for the Commonwealth and counsel for the defendant an opportunity to make their arguments. The Court has also read the entirety of the presentence report, including voluminous information regarding his upbringing, his background, his family life, his mental health issues, and his prior contacts with law enforcement and the judiciary.

The Court does not see within any these materials, or in any of the evidence admitted at trial, or in any of the testimony adduced at trial, a single mitigating circumstance or justification that warrants the exercise of this Court's authority to reduce or modify the sentence determined by the jury. Indeed, it is entirely appropriate given the egregious nature of his misconduct, that each of these sentences should run consecutive to each other.

Therefore, the Court sentences Charles Severance as follows.

On Count One, the Capital Murder of Ruthanne Lodato, the Court sentences Charles Severance to imprisonment for life and a fine of $100,000.

On Count Two, the Use of a Firearm in the Commission of the Murder of Ruthanne Lodato, the Court sentences Charles Severance to imprisonment for three years.

On Count Three, the Malicious Wounding of Dorcas Franko (also known as Janet Franko), the Court sentences. Charles Severance to twenty years imprisonment and a fine of $100,000.

On Count Four, the Use of a Firearm in the Commission of the Malicious Wounding of Dorcas Franko (also known as Janet Franko), the Court sentences Charles Severance to imprisonment for five years.

On Count Five, the Capital Murder of Ronald Kirby, the Court sentences Charles Severance to imprisonment for life and a fine of $100,000.

On Count Six, the Use of a Firearm in the Commission of the Murder of Ronald Kirby, the Court sentences Charles Severance to imprisonment for five years.

On Count Seven, the First Degree Murder of Nancy Dunning, the Court sentences Charles Severance to imprisonment for life and a fine of $100,000.

On Count Eight, the Use of a Firearm in the Commission of the Murder of Nancy Dunning, the Court sentences Charles Severance to imprisonment for five years.

On Count Nine, Possession of a Firearm by a Felon on November 11, 2013, the Court sentences Charles Severance to imprisonment for five years.

On Count Ten, Possession of a Firearm by a Felon on February 6, 2014, the Court sentences Charles Severance to imprisonment for five years.

Each of these sentences is to run consecutive to each other, for a total as follows, three consecutive life sentences plus 48 years in prison plus $400,000 in fines.