# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Daniel G. Wyatt

July 28, 2015

Case Nos. CR15000074-00 and CR15000162-00

BY JUDGE VICTOR V. LUDWIG

This matter comes before the Court on the motion to suppress filed by the defendant, Daniel G. Wyatt. The Commonwealth alleges Wyatt committed two acts of obtaining a drug by fraud. The parties argued the matter on June 23, 2015.

*Facts*

The allegations supporting the first indictment (earlier charged but involving facts alleged to have occurred later in time than the incident giving rise to the second indictment) are that Wyatt, a certified nursing assistant, gave a patient two pills of Tylenol instead of the prescribed four pills of Vicodin on February 25, 2014. Wyatt allegedly gave the patient these pills in a paper cup instead of the standard sealed package. The patient (perhaps sadly for Wyatt, also a medical professional) took one pill, found it was not relieving her pain, and contacted the hospital. Eight days later, after a hospital investigation, Wyatt was asked to take a urine test. For three hours, he claimed he could not produce a sample. During those three hours, the Commonwealth alleges that Wyatt admitted he had previously been discharged from Rockbridge Memorial Hospital and the University of Virginia for suspected diversion of drugs. Also during those three hours, the Commonwealth claims Wyatt stated he took three or four pills a day to support his addiction to Vicodin.

The second offense concerns electronic records of Wyatt's withdrawal of medications from November 1, 2011, through February 24, 2014. A machine (for lack of a better acronym, the MTM, or, for variety, the machine) dispenses drugs in the emergency room, recording what nurse withdraws the medication, for what patient the medication is prescribed, and what the doctor's prescription for the medication is. The Commonwealth alleges that, during the two year and three month time period, Wyatt "overrode" the dosage authorized by a physician a statistically anomalous number of times, withdrawing more than the prescribed dosages from the MTM. To support its prosecution of this offense, the Commonwealth would seek to introduce Wyatt's statements, made in the aftermath of the offense of February 25, 2014, regarding the circumstances of his dismissal from other hospitals and about his Vicodin habit.

*Applicable Law*

A court can try a defendant charged with more than one offense in a single trial if (a) justice does not require separate trials and (b) the offenses meet the requirements of Rule 3A:6(b) or (c) if the defendant and the Commonwealth's attorney both consent to the joinder. Va. Sup. Ct. R. 3A:10(c). Rule 3A:6(b) permits the Commonwealth to charge a defendant with two or more offenses as separate counts on the same indictment when the offenses are based on the same act or transaction or are based on two or more acts or transactions that are connected or constitute parts of a common scheme or plan. Va. Sup. Ct. R. 3A:6(b). Setting aside those cases in which the parties consent to join the trials (in which circumstance, the Court need not make any decision), it is clear that a trial court is not to conflate its assessment of the interests of justice with the other (collective) criterion. "[T]he Commonwealth [is] required to establish both of the two . . . conditions of Rule 3A:10(c), namely, that the offenses satisfied the requirements of Rule 3A:6(b), and that justice did not require separate trials." *Scott v. Commonwealth*, 274 Va. 636, 644 (2007).

Although the Rule 3A:10(c) addresses the broader criterion first, *Scott* states the more reasonable order for consideration. The practical effect of the Rule is that the interests of justice trumps evidence that one of the four circumstances of Rule 3A:6(b) exists. Hence, even if there is evidence that (a) the offenses are based on the same act or transaction, (b) the offenses are connected, (c) the offenses constitute parts of a common scheme, or (d) the offenses constitute a common plan, the cases will be tried together only if the overarching principle of the interests of justice do not mandate separate trials. Although one might persuasively argue that the consideration of the interests of justice is the threshold issue, it is seems clear that it comes into play only after one has concluded that the Commonwealth has proved at least one of the other four criteria in a contested case. If that happens, then

the cases will be tried in a single trial only if the interests of justice permit it.

As a preliminary matter, I note that two avenues leading to a single trial are closed. First, by filing his motion to sever, Wyatt has emphatically expressed a lack of consent to joining the two offenses. Second, the Commonwealth has, with good reason, not argued that the offenses are based on the same act or transaction. Before the Court are two separate instances of fraudulently obtaining a drug; one allegedly occurring over the course of more than two years and the other occurring on a single day outside that range of years. If justice does not require the Court to try the offenses separately, the Court may then only join the offenses if they are connected, part of the same scheme, or part of a common plan.

## A. *The Connection between the Offenses*

Our appellate courts have been less than clear in their explanations of when two offenses are "connected" under Rule 3A:6. One widely cited case explains that "[t]wo offenses are connected when they are 'so intimately connected and blended with the main facts that they cannot be departed from in propriety'." *Spence v. Commonwealth*, 12 Va. App. 1040, 1043 (1991) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 273 (1970)). It may rightly give the Court pause that *Spence*'s definition of connected offenses for joinder coincidentally comes from a decision on the issue of the admissibility of "other wrongs" as evidence (a distinctly different issue from the question of joinder). Unfortunately, there are not many better options.

The Virginia Supreme Court offered another potential definition a year later, when it stated separate crimes should be tried in a single trial when they are "closely connected in time, place, and means of commission." *Satcher v. Commonwealth*, 244 Va. 220, 229 (1992). However, given the context of the observation, it is unhelpful because that standard for connectivity seems to be more of an expression of the demands of Rule 3A:6 as a whole than a definition of the single connection element. "From the evidence and the reasonable inferences to be drawn therefrom, it is clear that the two or more acts involved in this case constituted parts of a common scheme or plan and were closely connected in time, place, and means of commission, all of which supports the use of a single trial." *Id.* Although in *Scott v. Commonwealth*, the Court made it clear the elements of Rule 3A:(6) must be considered independently of each other, *see id.*, 274 Va. 636, 645-46 (2007) (explaining a common scheme and a common plan are not synonymous but also not mutually exclusive), it specifically declined to address the issue of connectivity. "[B]ecause the Commonwealth does not argue that the pending offenses were . . . 'connected' . . . we limit our consideration of Rule 3A:6(b) to . . . 'common scheme or plan'. . . ." *Id.* at 274 Va. at 644. Most recently, in *Walker v. Commonwealth*, 289 Va. 410,

770 S.E.2d 197, 199, n. 3 (2015), the Court listed the "connected" criterion as a distinct element of 3A:6(b), but, because of the issue on appeal, it was not an occasion to define more clearly how trial courts are to assess whether two crimes are "connected." .

However, the Court in *Walker* may have clarified the use of the term "connected" as it was used in *Satcher*. "[O]ffenses may be considered parts of a common scheme or plan *when* they are 'closely connected in time, place, and means of commission. . . .'" *Walker,* 770 S.E.2d at 199 (emphasis added). That is different from the Court's statement in *Satcher* that "two or more acts involved in this case constituted parts of a common scheme or plan *and* were closely connected in time, place, and means of commission." *Satcher*, 244 Va. 220 at 229. The *Satcher* Court seemed to be using time, place, and means as determiners of connectivity; the *Walker* Court seems to be saying that connection in time, place, and means are evidence of a common scheme or plan, but not that proximity in time and place and similarity of means establish the separate criterion of the crimes being connected. That observation might appear to be diluted by the Court's next comment: "We are not persuaded that the general vicinity of South Hill and a span of thirteen days sufficiently connects the four transactions here any more than the general vicinity of Whitesville and a span of thirteen weeks did in *Spence*. Similarly, we are not persuaded that the pattern of the transactions identified by the Court of Appeals in this case was sufficiently specific to establish an unusual and unifying *modus operandi.*" *Walker,* 770 S.E.2d at 199. I suggest that it is only an appearance of dilution because the Court in *Walker* specifically stated that it was not addressing connectivity.

The decision in *Spence* does not mix the definition of "connected" with the definition of common plan or scheme, though it does combine its discussion of the latter two elements. Yet its muddling of an evidentiary standard with a joinder standard is less than ideal because the Virginia Supreme Court has stated that, although both Rule 3A:6(b) and Rule 2:404 require courts to determine if a common plan or scheme exists, the joinder analysis of Rule 3A:6(b) is "different" from the evidentiary analysis of Rule 2:404(b). *Walker,* 770 S.E.2d at 200. (That difference, however, seems to be more of a minor interstice than a gaping chasm, as the Court in *Walker* then immediately went on to examine the principles of the evidentiary rule to "illustrate" its joinder analysis. *Id.*) Combining the two Rules appears to be unavoidable to analyze this single element, because only *Spence,* with its borrowed definition, seems to examine "connected" independently of the other elements.

Applying *Spence* then, I reach the same result I would for the evidentiary question. The facts of both cases can be fully explained without raising the specter of the other. Each offense has its own set of "main facts" independent of the other. Withholding knowledge of one offense would not create a logical disruption in the narrative of either offense. Even if I apply the more

inexact *Satcher* standard, I still do not find the two offenses are connected. Although they occurred in the same place, with one offense following the other in a relatively short period of time, they were not performed in the same manner. Moreover, the following analysis of the two offenses as a common scheme will explain in more detail how each crime had a separate *modus operandi*.

## B. *The Offenses as a Common Scheme*

"The term 'common scheme' describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain identified crimes." *Scott,* 274 Va. at 646. The Court in *Scott* found that no common scheme existed when the Commonwealth proved that over a four month period in one large city, various people were robbed outside their homes during the late evening hours by a person displaying a gun, demanding money, credit cards, and occasionally the victims' PIN. The Court found this evidence only bore a "general similarity of manner" and lacked shared idiosyncratic features. *Id.*

The evidence of this case also seems to suggest a lack of shared idiosyncratic features between the two offenses. One indictment alleges that, for more than two years, Wyatt overrode physicians' prescriptions or provided medications in dosages some factor higher than the other emergency room nurses. The other indictment alleges that, on one day, for one patient, Wyatt switched Tylenol for Vicodin. This evidence suggests two schemes of fraudulently obtaining drugs, not one: (1) Wyatt obtained drugs by withdrawing more than the patient needed and then pocketed the excess, and (2) Wyatt obtained drugs by surreptitiously giving the patient a substitute and then pocketed the entire prescription.

The Commonwealth suggests that the offenses share idiosyncratic features because in both instances Wyatt accessed the MTM to obtain the drugs. However, doing nothing more than withdrawing a prescription from the machine is not an idiosyncratic *modus operandi*. A *modus operandi* could hardly be called idiosyncratic when it presumably would be the preferred method of fraudulently obtaining drugs for any one of the hundreds of nurses who use the same kind of machine. Charges of obtaining a drug through fraud that both feature Wyatt's use of MTM share only a "general similarity of manner." Perhaps (but only perhaps) if Wyatt had performed an override of the doctor's prescription on February 25, 2014, or if multiple patients had complained of receiving Tylenol instead of Vicodin on the days he overrode a doctor's prescription from November 1, 2011, to February 24, 2014, the offenses would share sufficiently distinct similarities. Instead, the only fact the two offenses have in common is that Wyatt used the same kind of machine in the same hospital; hardly the kind of the unique, distinguishing features *Scott* requires.

C. *The Offenses as a Common Plan*

Two or more offenses constitute a common plan when they are related to one another with the common purpose of accomplishing the same particular goal. *See Scott v. Commonwealth*, 274 Va. 636, 646 (2007). For a common plan to exist, the goal must be one that any one of the individual offenses cannot independently accomplish. *Walker,* 770 S.E.2d at 200 (quoting *Spence v. Commonwealth*, 12 Va. App. at 1044 (1991)). "The key factor . . . is that the goal furthered by the offenses must be extrinsic to at least one of them." *Id.* at 201. The offenses committed in the furtherance of this single, extrinsic goal must occur sequentially or interdependently. *See id.* at 200–01. In *Walker,* the Virginia Supreme Court overturned the Court of Appeals' determination that separate sales of drugs in the same general vicinity by the same defendant could constitute a common plan when the common goal of each sale was to profit and cultivate return customers. "Profiting from the sale of drugs, including cultivating return customers, is intrinsic to the offense of selling drugs." *Id.* at 201.

The Commonwealth has suggested Wyatt fraudulently obtained prescription drugs for the particular goal of supporting his Vicodin addiction. Neither Wyatt's alleged goal nor his method of accomplishing it qualify as a common plan under *Walker*. Feeding a drug habit is not the kind of goal extrinsic to procuring drugs necessary for a common plan. If selling drugs to establish a customer base is not a common plan, surely a person's stealing drugs for no other reason than to satiate his own addiction is not one either. Even if this goal were the type *Walker* contemplates, the means Wyatt employed to reach it would not be sufficient. The thefts could not be called interdependent, as Wyatt did not need to attempt his Vicodin-Tylenol shell game before performing a single override, just as he could have continued with the overrides without ever switching out a single pill. Finally, though the offenses happened to occur one after the other, they could not properly be called sequential, as their order was not purposefully or necessarily logical. Either one of them could have occurred first or second and either one of them could have never occurred at all without foreclosing the possibility of committing the other.

D. *The Requirements of Justice*

Justice requires separate trials when highly prejudicial evidence of one crime would not be admissible in the trial of the other. *See Long v. Commonwealth*, 20 Va. App. 223, 226 (1995). "When the jury hears that a defendant has been convicted of a felony, a fact not probative of an element of the offense being tried, the evidence has a tendency to prejudice the defendant in the minds of the jurors. The admission of a felony conviction is suggestive of the defendant's criminal propensity and tends to adversely affect his presumption of innocence. Such evidence also has a tendency

to adversely affect the defendant's sentence, fixed by the jury." *Id.* at 227 (citations omitted). In *Long*, the defendant faced one charge of possession of a firearm after having been convicted of a felony, a second charge of possession of heroin, and a third of possession of a firearm while possessing heroin. Because evidence of Long's felony conviction would not have been admissible in a trial on the other two possession charges, the Court concluded that justice required that the offenses should have been tried separately. *Id.*

The question for this case then, is whether the (what appears to be statistical) evidence of Wyatt's overriding doctors' prescriptions at an above average rate over a long period would be admissible in a trial of the events alleged to have occurred on February 25, 2014. Allowing such evidence of a separate bad act is generally inadmissible to prove guilt of the crime at issue. *See Guill v. Commonwealth*, 255 Va. 134, 138 (1998). Of course, this rule is not absolute. Indeed, courts have issued a host of standards and principles in an effort to define the rule's exceptions.

Evidence of other crimes is admissible if it tends to prove any element of the crime charged, including the defendant's motive, intent, or knowledge. *Id.* (citing *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). This evidence must have a legitimate probative value greater than the incidental prejudice it may cause the defendant. *Id.* at 139. The separate act must also have a "causal relation or logical and natural connection" to the offense being tried. *Id.* at 140 (quoting *Barber v. Commonwealth*, 182 Va. 858, 868 (1944)). This evidence must also have a purpose other than to demonstrate the defendant has a propensity to commit crimes or a particular type of crime (leading to the unsupported inference that he must have committed the central one at issue). *Id.* (citing *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). Furthermore, the evidence is permitted if it is connected to, leads up to, or is a part of the general scheme of the crime charged. *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970) ("Frequently it is impossible to give a connected statement showing the crime charged without incidental reference to such contemporaneous and similar crimes. . . .").

In a Rule adopted July 1, 2012, the Supreme Court also addressed the question of introducing "other wrongs" as evidence. *See* Va. Sup. Ct. R. 2:404(b). The Rule only seems to differ from the case law that precedes it in that it enumerates more examples of the type of evidence that would be relevant to the offense being tried: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan." *Id.* Most importantly, however, both this Rule and the prior case law only allow evidence of other crimes when the "legitimate probative value of such proof outweighs its incidental prejudice." *Id.*; *see Guill*, 255 Va. at 139. For this reason, I believe 2:404(b) does not supersede the case law and does not require separate analysis.

Introducing evidence of the offense that spanned over a period of more than two years would add little to proving Wyatt's knowledge that he substituted Tylenol for Vicodin on February 25, nor would it suggest a motive for doing so (other than a motive to obtain drugs for his own use, an issue I discussed above). It may tend to prove Wyatt's intent for the February 25 offense, as it seems to suggest that Wyatt did not switch the Tylenol for Vicodin accidentally. However, rather than tending to prove intent, it seems more likely that this evidence would only show Wyatt performed a separate, but similar, "wrong act" in the past, supporting the impermissible inference. Additionally, although the offenses have a temporal connection, February 25 is not within the two year and three month range, but it is one day outside of it, they do not have a "causal or natural and logical" connection. The Commonwealth has not alleged that overriding the doctors' prescriptions on a frequency greater than the average of the other nurses over a two year period caused Wyatt to swap Vicodin for Tylenol on February 25. A factfinder would not need to hear the details of the statistical analysis evidence fully to understand the events of February 25 or *vice versa*.

I see only two potentially overlapping items of evidence between the two offenses. One would be the statements Wyatt made while awaiting his drug test that came as a result of switching the Vicodin for Tylenol. At the hearing, the Commonwealth expressed its desire to use those statements in support of both offenses. However, although the content of those statements is potentially relevant to both offenses, a jury would have no need to hear the details of both offenses to understand the statements. Assuming the statements are otherwise admissible, withholding the exact circumstance in which Wyatt spoke, awaiting a drug test after the discovery of his Tylenol ruse, would not remove or diminish their potentially probative value with respect to the crime charged in the later indictment.

The second potential overlap lies in the fact that Wyatt used the same kind of machine to obtain the medication for both offenses, but it is potential nearly in the abstract. Even if the Commonwealth will need to explain that Wyatt obtained the medication from MTM, it does not follow that it would then also need to offer evidence that Wyatt has a history of overriding doctors' prescriptions on the MTM to describe the February 25 offense. His offense that day was in what he did after removing the drugs from the MTM, substituting Tylenol for Vicodin, not that he obtained the drugs from the MTM in a fraudulent manner. The tenuous connection between the statistical analysis of Wyatt's alleged abuse of the MTM and the events of February 25, along with the fact that the question of intent could much more likely be established through other more direct means, for instance, Wyatt's statement about his drug use, makes the probative value of the evidence of the other offense a pebble next to the millstone of prejudice it would cause.

## Conclusion

Although I confess that I am less than satisfied with the analysis of the issue of whether the crimes are "connected," I take comfort in the fact that my reading of the case law does not give me much guidance in making that determination. I find with no equivocation, however, that the alleged acts by Wyatt do not constitute parts of either a common scheme or a common plan. Moreover, were it otherwise, I would also find that the interests of justice require separate trials.