COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Humphreys and Friedman
Argued at Lexington, Virginia

**UNPUBLISHED**

MELVIN AVON THOMAS

MEMORANDUM OPINION[*] BY
v.        Record No. 0613-21-3        JUDGE FRANK K. FRIEDMAN
                                                                AUGUST 16, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
W. Chapman Goodwin, Judge

Dana R. Cormier (Dana R. Cormier, P.L.C., on brief), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


The Augusta County Circuit Court convicted appellant of conspiracy to commit grand

larceny and two counts of grand larceny, in violation of Code §§ 18.2-22 and 18.2-95,

respectively, following a February 2021 bench trial.  The court sentenced appellant to a total of

fifteen years of incarceration with eight years and six months suspended.  On appeal, appellant

argues that the trial court erred in admitting evidence of "other crimes" that occurred in Hagerstown,

Maryland, Hanover, Virginia, and Campbell County, Virginia.  He also asserts that the trial court

erred in admitting certain business records because they lacked sufficient indicia of trustworthiness.

Finally, appellant challenges the sufficiency of the evidence to sustain his convictions.

This case provides a stark reminder that our lives are constantly "tracked" via our cell

phones, GPS devices, and social media postings.  Appellant, Melvin Avon Thomas, left a trail of

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

evidence in the ether that abundantly supports his convictions. The question at hand is whether the evidence against him was reliable and properly admitted at trial.

BACKGROUND

In accordance with familiar principles of appellate review, we state the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

The Augusta County Heist Underlying Appellant's Convictions

On the night of December 28, 2018, surveillance cameras recorded the theft of property from the Beverage Tractor dealership in Augusta County, Virginia. At approximately 8:30 p.m., two men wearing dark clothing walked onto the lot and loaded a tractor on one trailer and two Kubota skid steers onto another trailer.[1] The men then departed in two white pickup trucks stolen from the premises, a Dodge and a Ford F-350, each bearing the dealership's logo and towing a trailer. Collectively, the stolen property totaled $150,000 in value.

The Dodge that was taken was equipped with a GPS tracking device that recorded its movements. The GPS data revealed that, immediately after the theft, the Dodge traveled north along Interstate 81 before stopping at a gas station in New Market, Virginia at approximately 10:01 p.m. Surveillance video from the gas station depicted the suspects fueling one of the stolen trucks after using cash to pay for gas. The truck displayed the Beverage Tractor dealership logo and towed a trailer, although its load was outside of view. After leaving the gas station, the Dodge

---

[1] A skid steer is a small, cabbed, rigid-framed, engine-powered piece of equipment with lift arms that can connect to a wide variety of labor-saving tools or attachments. A skid steer can perform a variety of functions ranging from moving, carrying, and loading materials to digging, grading, and trenching operations.

continued traveling north on Interstate 81 before stopping on the shoulder at 10:48 p.m.  The following morning, on December 29, police discovered the truck abandoned near mile marker 296.  The trailer with the two Kubota skid steers was still attached and had a flat tire.  Police did not immediately locate the other stolen truck or equipment.

<u>"Other Crimes" and the Related Police Investigation</u>

In the early morning hours—at 3:08 a.m. on December 29—following the Augusta County theft, surveillance cameras recorded two men stealing a Kubota skid steer from a heavy equipment dealership in Hagerstown, Maryland.  The men loaded the equipment onto a trailer and towed it away using a white pickup truck displaying the Beverage Tractor dealership logo.

On January 25, 2019, Hanover County Sheriff's Investigator Matthew Gathright arrived at a heavy equipment dealership in Hanover, Virginia in response to a reported "larceny of a Kubota skid steer."  From his review of surveillance video from the incident,[2] Gathright determined that the perpetrators loaded the skid steer onto a trailer attached to the same Beverage Tractor pickup truck that was used to commit the theft in Hagerstown, Maryland.

Two days later, on January 27, Maryland Detective Ryan Minnick received a call reporting that appellant had attempted to sell the caller a stolen Kubota skid steer.[3]  The caller provided police with appellant's name, cell phone number, and the address of a lot in Bowie, Maryland where the caller had inspected the stolen skid steer.  Minnick traveled to the Bowie address the same day, where he found the skid steer from the Hanover dealership on a trailer attached to the Ford F-350

---

[2] The trial transcript reflects that the Commonwealth played a portion of surveillance video depicting the theft.  It appears from the record, however, that the Commonwealth never introduced the video as an exhibit.  Nonetheless, appellant did not challenge Gathright's testimony regarding the video's contents.

[3] At trial, the Commonwealth introduced a copy of an affidavit seeking a search warrant for appellant's Google subscriber data.  Although the caller never testified at trial, the affidavit contained the information he relayed to police.  Appellant did not object to the admissibility of the affidavit on hearsay or confrontation grounds.

pickup truck that was stolen from Beverage Tractor. Minnick could not confirm the origin of the trailer, however, because its "VIN plate"[4] had been removed; he also observed that the stolen Ford displayed a Maryland license plate that was not registered to the vehicle.

The following day, police executed a search warrant at the Bowie, Maryland lot. Inside of a camper on the property, Minnick found a box holding numerous documents containing appellant's name and contact information. A handwritten document resembling a lease listed appellant's name, the Bowie address, the name of the property's landlord, and the landlord's address. A letter from December 2017 included appellant's name and email address and identified a nearby residence in Severn, Maryland as his home address. Other documents found on the Bowie, Maryland lot included a 2017 bank statement, an expired vehicle registration, and insurance documents from 2018 which similarly contained appellant's name and the same Severn, Maryland address. A 2017 repair invoice and a business card for a construction company found at the scene also displayed appellant's name and a cell phone number matching the number police obtained from the initial caller who had notified police.[5] On the opposite side of the lot, Minnick discovered a Ford F-150 pickup truck containing expired vehicle insurance and registration documents that listed appellant as the truck's registered owner and identified the same Severn, Maryland address as his residence.

In total, police discovered six vehicles, seven trailers, and two pieces of heavy equipment on the Bowie lot. One of the vehicles, a stolen Ford F-450 tow truck, had been "re-painted black" from its original color and was towing a sedan with a "punched out ignition." Two other vehicles on the lot also had "punched out" ignitions. Minnick ultimately determined that half of the vehicles on the

---

[4] "VIN" is an acronym denoting "vehicle identification number."

[5] This cell phone number matched the number listed on the other documents found on the Bowie lot bearing appellant's name. Police later discovered that the same cell phone number was linked to appellant's Facebook and Google accounts.

- 4 -

premises were stolen. Other vehicles could not be identified because their VIN plates had been removed.

On March 1, 2019, Jed Campbell reported the theft of a Kubota skid steer, a Ford F-250 pickup truck, and a trailer from his heavy equipment dealership in Campbell County, Virginia. The stolen Ford had a GPS tracking device that recorded its location. From the vehicle's GPS data, Campbell County Sheriff's Investigator Curtis Rice determined that the Ford left the dealership and traveled north to a gas station following the theft. At 9:37 p.m., gas station surveillance cameras recorded the Ford's arrival as it towed the stolen equipment to a fuel pump. The truck's driver and sole occupant used cash to pay for gas and fueled the truck before driving away with the stolen property. Rice developed appellant as a suspect in this Campbell County theft. Rice later used the stolen Ford's GPS location data to trace its route northward to an address in Baltimore, Maryland, where he eventually "recovered" the stolen vehicle.

Phone Records, the Google "Geofence Warrant," and Related Social Media Search Warrants

During his investigation, Gathright obtained a "Google geofence warrant" to identify specific cellular devices that were in the vicinity of the dealerships in Augusta, Hagerstown, and Hanover at the time of the thefts.[6] In response, Google identified "two anonymized suspicious device IDs that were in the immediate area of the three [dealerships] during the requested

---

[6] According to Gathright, a "geofence" uses "GPS coordinates" to "set perimeters" around specific locations of interest. In response to a geofence warrant, Google provides police with an "itemized" list of "all devices that communicated with or probed the WiFi spots within the 'geofence'" during a requested time frame.

While in recent years geofence warrants have been the subject of Fourth Amendment debate, with concern expressed regarding their potential for overbreadth, here appellant does not contest the validity of the Google geofence warrant, and we therefore do not address these concerns. *See, e.g.*, *United States v. Chatrie*, ___ F. Supp. 3d ___, ___ (E.D. Va. Mar. 3, 2022) (finding a Google geofence warrant invalid where it did not establish particularized probable cause to search every person within a particular area and warning that "[a]s Fourth Amendment law develops in a slow drip, 'technology [continues to] enhance[ ] the Government's capacity to encroach upon areas normally guarded from inquisitive eyes'" (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018))); *cf. Matter of Search Warrant Application for Geofence*

timeframe." From that information, Gathright concluded that "the same device . . . was [present] at all three of [the dealership] locations" during each theft. Gathright subsequently submitted a "secondary search warrant" to Google requesting the identity of the subscriber associated with the two "anonymized device IDs." Google responded with business records identifying appellant as the subscriber and disclosing his name, email address, and cell phone number.[7]

Gathright later forwarded appellant's name and cell phone number to Virginia State Police Trooper Jared Martin. Using that information, Martin identified a Facebook social media account displaying photographs that matched known images of appellant. Martin subsequently submitted a "preservation request" and a search warrant to Facebook "for any and all identifying information related to that account." In response, Facebook provided business records identifying appellant as the account's owner and disclosing his name, date of birth, email address, and cell phone number.[8] In response to a subsequent search warrant seeking "account information" associated with appellant's cell phone number, Google disclosed appellant's unique Google account number. At trial, Martin testified that no other person or phone number was associated with that Google account.

Martin obtained "a plethora of information" from Google pertaining to appellant's Google account and cell phone number, including GPS location data, internet search history data, map

---

*Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 353 (N.D. Ill. 2020) (upholding a Google geofence warrant and noting that "the Fourth Amendment does not deal in precision, but rather in probability" and that "the government must demonstrate a fair probability that evidence of a crime will be located at a particular place, and a search warrant need not be rooted in pinpoint accuracy").

[7] That information matched the identifying information found on the documents police previously seized from the lot in Bowie, Maryland.

[8] The subscriber information for the Facebook account and Google account was identical.

usage data, photographs, and videos. He also obtained appellant's cell phone records, including "call records" and "cell site data," that "corresponded [to] the data from Google."

Martin concluded from his review of the records that immediately prior to the Beverage Tractor theft on December 28, 2018, appellant's phone performed multiple internet searches for the value of Kubota construction equipment, specific models of Kubota skid steers, the location of the Beverage Tractor dealership, and other Kubota heavy equipment dealers in the area. At approximately 10:15 p.m. on December 28, the phone searched for directions and navigated to Hagerstown, Maryland; the phone also subsequently searched for directions to the Campbell County dealership. Additionally, Martin discovered photographs taken at the Bowie, Maryland lot that depicted appellant with heavy equipment. Police also found videos of appellant, including one showing him holding large denominations of cash.

Police used appellant's Google and telephone records to determine his cell phone's location at the time of the thefts. Virginia State Police Special Agent Travis Barr generated a series of slides illustrating the phone's movements and activities during each larceny. Barr testified that on the night of the first theft, at 8:27 p.m. on December 28, 2018, appellant's phone was within "67 meters" of Beverage Tractor. Appellant's cell phone then traveled northward along Interstate 81 until, at 10:02 p.m., it arrived within "88 meters" of the New Market gas station.[9] At 10:47 p.m., the phone traveled to within "3 meters" of mile marker 296 on Interstate 81.[10] At the time of the Hagerstown theft the following day, at 3:02 a.m. on December 29, appellant's phone was within "72

---

[9] That data coincided with the GPS data from the stolen Beverage Tractor Dodge, which revealed that the truck traveled north along Interstate 81 until it stopped at the New Market gas station at approximately 10:01 p.m., following the first theft.

[10] This was the location where police discovered the stolen Beverage Tractor Dodge abandoned by the highway on the morning after the first theft.

meters" of the Hagerstown dealership.[11]  Shortly after the theft, at 5:27 a.m., appellant's phone was within "1200 meters" of the Bowie, Maryland property.  At 7:38 a.m., the phone was at appellant's Severn, Maryland address; the next day, it returned to the Bowie lot.  Finally, Barr testified that at 4:06 a.m. on January 25, 2019, appellant's phone traveled to the heavy equipment dealership in Hanover County.

### Thomas' Arrest and Statements to Police

In June 2019, police arrested and interviewed appellant in Maryland.  Appellant denied ever traveling to Virginia and claimed that the cell phone number police attributed to him actually belonged to his girlfriend.[12]

### Relevant Rulings and Objections

The Commonwealth filed a motion *in limine* to obtain leave of court to introduce evidence of the other unadjudicated thefts in Hagerstown, Maryland, Hanover, Virginia, and Campbell County, Virginia as circumstantial evidence to establish a common plan or scheme and to establish Thomas' identity as the perpetrator of the Augusta County thefts from Beverage Tractor on December 28, 2018.  Thomas argued the "other crimes" (1) were not related to a specific, extrinsic goal or plan, (2) were not sufficiently idiosyncratic to establish a common scheme, (3) did not establish the identity of the perpetrators, and (4) did not have probative value outweighing their prejudicial impact.  The trial court rejected Thomas' claims under Virginia Rule of Evidence 2:404(b) and admitted the evidence.

---

[11] That data coincided with the time signature on the surveillance video from the Hagerstown dealership, which indicated that the theft occurred there at 3:02 a.m. on December 29, 2018.

[12] The cell phone number police attributed to appellant was the same one identified on numerous documents as belonging to appellant and that was linked to appellant's Facebook and Google accounts.

At trial, Thomas also sought to exclude introduction of Google account information as a business record after Google produced the record in response to a search warrant request. Thomas contended the information was not trustworthy under Virginia Rule of Evidence 2:803(6). Again, the trial court admitted the evidence.

At the conclusion of the Commonwealth's case-in-chief, appellant moved to strike, arguing that there was no proof of an agreement necessary to establish a conspiracy.[13] The trial court found that "there were at least two parties involved" in a "pretty coordinated operation." The perpetrators "went to the store the same way in each of the robberies," proving that they "were involved in the same crime" and "made plans" to commit it. Accordingly, the trial court denied the motion.

In closing argument, appellant argued the sufficiency of the evidence with respect to both the conspiracy and larceny charges. Appellant first contended that the Commonwealth failed to prove identity, arguing that although the evidence established that "a phone connected to a Google account associated with [appellant]" was "in the vicinity" of the various thefts, it failed to prove that appellant ever possessed the phone or any of the stolen items. Additionally, appellant argued that "evidence of two people committing a crime together" is insufficient to prove "a pre-planned agreement" necessary to establish conspiracy.

The trial judge, however, rejected these arguments. The court found that "there were a minimum of two parties involved," proving "an agreement between the parties" necessary for conspiracy. The court also found that "the white truck from the [first theft] was clearly involved in all of the robberies," and appellant was "the only person tied to [the] phone" that was also "clearly tied to all of the robberies" through "geotracking" evidence. Additionally, the court found that the presence of documents bearing appellant's identifying information proved his ownership or control

---

[13] Appellant did not move to strike the grand larceny charges at the initial motion to strike. The trial court, however, dismissed a related charge of grand larceny with intent to sell.

of the Bowie lot where much of the stolen property was located. Finally, the court found that "there's clearly evidence that the theft occurred" in Augusta County, "the value exceeded five hundred dollars," and the "totality of the circumstances" proved that appellant "committed the crimes."

This appeal follows.

ANALYSIS

I. Evidentiary Arguments

A. Standard of Review

"[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Id.* (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* (quoting *Carter*, 293 Va. at 543-44).

B. "Other Crimes" Evidence

The Commonwealth moved *in limine* to admit evidence of the thefts that occurred in Hanover, Virginia, Campbell County, Virginia, and Hagerstown, Maryland, at appellant's trial for the Beverage Tractor thefts. The Commonwealth argued that the "other crimes" were admissible as proof of a "common scheme or plan" and probative of appellant's identity as the perpetrator. Following briefing and argument, the trial court ruled in an opinion letter that the evidence was admissible under Rule 2:404(b) to prove appellant's identity. The court cited

*Chichester v. Commonwealth*, 248 Va. 311, 326 (1994) (quoting *Spencer v. Commonwealth*, 240 Va. 78, 89 (1990)), for the proposition that a defendant's *modus operandi* is "competent evidence where there is a disputed issue of identity." The court concluded that the evidence was admissible to prove identity because "a clear pattern exists with sufficient idiosyncrasies showing the Defendant's involvement with the theft in Augusta County." The trial court also ruled the evidence was admissible to show the existence of a common scheme or plan, finding that "the evidence shows a common plan or scheme of stealing Kubota skid loaders and other heavy equipment in Virginia and transporting them to Maryland to sell."

On appeal, appellant contends that the trial court erred in granting the Commonwealth's motion *in limine*. Relying on *Scott v. Commonwealth*, 274 Va. 636 (2007), and *Walker v. Commonwealth*, 289 Va. 410 (2016), appellant asserts that the other thefts were "not related to a specific goal" necessary to establish a "common plan," nor were they "sufficiently idiosyncratic" to prove a "common scheme." Moreover, appellant contends that the probative value of the "other crimes" evidence was "insignificant when weighed against the prejudice" to him.

Generally, "evidence which shows or tends to show that the accused is guilty of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is not admissible to show the accused's commission of the particular crime charged." *Kenner*, 299 Va. at 424 (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008)); s*ee also* Va. R. Evid. 2:404(b) (barring evidence of prior bad acts to prove criminal propensity). Rule 2:404(b) "explicitly allows" such evidence, however, "if its probative value outweighs its incidental prejudice" and "if it tends to prove any relevant fact pertaining to the offense charged," including "where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, *identity*, absence of mistake, accident, or if they are part of a *common scheme or*

*plan*." *Brooks v. Commonwealth*, 73 Va. App. 133, 147 (2021) (emphasis added) (quoting Va. R. Evid. 2:404(b)).

### 1. Common Schemes and Plans under Rule 2:404(b)

"[T]he terms 'common scheme' and 'common plan' are not synonymous." *Stickle v. Commonwealth*, 68 Va. App. 321, 339 (2017) (some internal quotation marks omitted) (quoting *Scott*, 274 Va. at 651). "However, neither are they mutually exclusive." *Id.* (citing *Scott*, 274 Va. at 646). "[A] series of crimes may exhibit both a common scheme and a common plan" and, therefore, "it is possible for the same set of facts to meet both definitions." *Brooks*, 73 Va. App. at 142 (citing *Scott*, 274 Va. at 646).

A common plan is "a series of acts done with a relatively specific goal or outcome in mind." *Walker*, 289 Va. at 418 (quoting David P. Leonard, *The New Wigmore: A Treatise on Evidence* § 9.2.2, at 572 (2009)). Such a goal "exists when the constituent offenses occur sequentially or interdependently to advance some common, extrinsic objective." *Id.* In *Walker*, the Supreme Court explained that breaking into a bank president's home to steal the bank keys in order to rob the bank would exemplify a common plan. *Id*.

A "common scheme," by contrast, is a series of "crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain identified crimes." *Cousett v. Commonwealth*, 71 Va. App. 49, 58 (2019) (citing *Scott*, 274 Va. at 645). The possible range of idiosyncratic features that may prove a "common scheme" is very broad. *Brooks*, 73 Va. App. at 143 (citing *Scott*, 274 Va. at 647); *see also Walker*, 289 Va. at 416 ("[O]ffenses may be considered parts of a common scheme or plan when they are 'closely connected in time, place, and means of commission.'" (quoting *Satcher v. Commonwealth*, 244 Va. 220, 229 (1992))). "However, the Commonwealth's evidence regarding idiosyncratic

- 12 -

features must permit an inference of a pattern of criminal activity by the same person; mere general similarities common to all offenses of the same type are insufficient." *Brooks*, 73 Va. App. at 143 (citing *Scott*, 274 Va. at 646).

In *Scott*, the Supreme Court reversed a trial court's joinder of nine separate robberies in a single trial based on the premise that each offense constituted part of a "common scheme or plan." 274 Va. at 639-40. Each robbery occurred at night in the same city within a four-month period and involved a single robber threatening a victim with a gun. *Id.* at 646. The Supreme Court declined to find a "common scheme," holding that the evidence proved "only separate crimes of the same type that share features that are likely similar to numerous other robbery offenses." *Id.* at 647. The Court also declined to find a "common plan," holding that "the evidence completely lacked any proof that the offenses were related to one another for the purpose of accomplishing a particular goal." *Id.*

Similarly, in *Walker*, the Supreme Court reversed a trial court's joinder of four drug distribution charges where the defendant dealt drugs four times in the same neighborhood within a thirteen-day period. 289 Va. at 419. The Court held that evidence that the defendant dealt the drugs the same way, in the same area, and within a short time frame was insufficient to establish a "common scheme" or *modus operandi*. *Id.* at 416. The Court also held that the Commonwealth failed to establish a "common plan," concluding that nothing proved that the defendant had a "particular goal" that was "not obtainable by the commission of any of the individual offenses." *Id.* at 417.

Thus, *Scott* and *Walker* involved a series of repetitive, but individual, "stick-ups" and drug sales that did not evidence a common undertaking. By contrast, in *Brooks*, we affirmed a trial court's joinder of six counts of grand larceny with intent to sell where each crime was part of both a "common scheme" and a "common plan." 73 Va. App. 133. Six times during a

four-month period, a thief stole rims and tires from "late-model" trucks parked overnight in residential driveways, leaving the trucks behind on cinder blocks. *Id.* at 139-40. Any time a truck was equipped with "lug nut locks," the thief broke a window to access "lug nut lock keys" inside the truck before removing its rims and tires. *Id.* GPS geolocation data from the defendant's truck established its presence at each theft. *Id.* at 140. Police found business cards advertising the defendant's tire re-sale business inside his apartment and storage unit. *Id.* The "idiosyncratic features between the crimes" established a "common scheme" because they were "more than general similarities common to all larcenies." *Id.* at 144. Further, we held that each theft was "committed in furtherance of [the defendant's] common goal to steal tires and rims to supply his business inventory," proving a "common plan." *Id.* at 144-45. We find the facts of the instant case are analogous to those considered in *Brooks*, and are distinguishable from those of *Scott* and *Walker*.

### 2. The "Other Crimes" Evidence was Properly Admitted under Rule 2:404(b)

#### a. The "Other Crimes" Evidence Tended to Prove Relevant Facts Pertaining to the Offenses Charged

The commonalities and idiosyncratic similarities between the "other crimes" evidence and the Augusta larcenies support the trial court's ruling admitting the "other crimes" evidence under the "common scheme or plan" exception to Rule 2:404(b).

First, the thefts in this case shared a constellation of "idiosyncratic" features establishing a "common scheme." *Cousett*, 71 Va. App. at 58 (citing *Scott*, 274 Va. at 645). Just as the thief in *Brooks* exclusively burglarized "late-model" trucks parked overnight in residential driveways, 73 Va. App. at 139-40, the thieves here specifically targeted Kubota dealerships at night. Additionally, just as GPS data placed the defendant's truck at each theft in *Brooks*, 73 Va. App. at 140, similar data proved that appellant's cell phone was present during the thefts at the Augusta County, Hagerstown, and Hanover dealerships and had searched for directions to the

Campbell County dealership before the fourth theft. In each theft, two men loaded skid steers onto trailers already located on-site and used stolen pickup trucks to haul the equipment to Maryland, paying cash for gas along the way. The thieves used the same pickup truck stolen from Beverage Tractor to perpetrate the subsequent thefts in Hagerstown and Hanover. Collectively, that evidence supports the trial court's finding that each crime was part of a "common scheme."[14]

"Identity" and "common scheme" are listed as separate factors in Rule 2:404(b), but their analysis is related. Commonalities among "other crimes" evidence can be relevant to prove identity, typically through establishing a *modus operandi*. *See Turner v. Commonwealth*, 259 Va. 645, 651 (2000). The Supreme Court has held that "evidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a 'signature.' Rather, it is sufficient if the other crimes bear 'a singular strong resemblance to the pattern of the offense charged.'" *Spencer*, 240 Va. at 90 (quoting *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989)).

In *Brooks*, this Court found that the perpetrator exhibited a distinctive *modus operandi*, leaving vehicles on cinder blocks and breaking windows to access "lug nut keys" where necessary. 73 Va. App. at 139-40. Here, as in *Brooks*, the evidence revealed a unique execution method. In each theft, two men loaded skid steers onto trailers already located on site and used stolen pickup trucks to haul the equipment to Maryland, paying cash for gas along the way. Notably, the thieves used the same pickup truck stolen from Beverage Tractor to perpetrate the

---

[14] The record in this case is much closer on the question of whether the Commonwealth established that each theft occurred "sequentially or interdependently to advance some common, extrinsic objective" proving a "common plan." *Walker*, 289 Va. at 418. The exception under Rule 2:404(b) involves a "common scheme or plan." Having already found that a common scheme was established, we need not address the common plan analysis. *See Abdo v. Commonwealth*, 64 Va. App. 468, 473 n.1 (2010) (ruling on best and narrowest ground available).

subsequent thefts in Hagerstown and Hanover. Thus, the other crimes "bear a singular strong resemblance to the pattern of" the Augusta County theft and are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Scott*, 274 Va. at 645. The trial court did not abuse its discretion in finding that the other crimes evidence was relevant and probative here.

b. The Trial Court Did Not Abuse its Discretion in Finding that the
Probative Value of the "Other Crimes" Evidence Outweighed its
Prejudice to Appellant and was Admissible

Appellant contends that, even assuming that the "other crimes" evidence was relevant under Rule 2:404(b), it remained inadmissible because its prejudice to appellant outweighed its probative value. "In addition to being relevant and material, other crimes evidence 'is subject to the further requirement that the legitimate probative value of the evidence must exceed its incidental prejudice to the defendant.'" *Kenner*, 299 Va. at 427 (quoting *Rose v. Commonwealth*, 270 Va. 3, 11 (2005)). *Accord* Va. R. Evid. 2:404(b) (stating the requirement that "the legitimate probative value of such proof outweighs its incidental prejudice"). "The responsibility for balancing the two considerations rests in the trial court's discretion and we will not disturb the trial court's determination in the absence of a clear abuse of discretion." *Kenner*, 299 Va. at 427 (citing *Ortiz*, 276 Va. at 715; *Spencer*, 240 Va. at 90).

"[O]ther crimes evidence is, by its nature, highly prejudicial to an accused." *Wilson v. Commonwealth*, 16 Va. App. 213, 220 (1993) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). "[I]n a jury trial, the introduction of inadmissible evidence of another crime . . . 'confuses one offense with the other, . . . and, by showing that the accused has a criminal propensity, tends to reverse [the] presumption of innocence.'" *Purvis v. Commonwealth*, 31 Va. App. 298, 308 (2000) (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 123 (1988)).

"However, the mere fact that a jury may consider evidence of a defendant's guilt for multiple offenses does not automatically constitute unfair prejudice . . . ." *Brooks*, 73 Va. App.

- 16 -

at 146. "If the evidence is also relevant to a contested issue in the case and otherwise admissible . . . the evidence of other crimes, while certainly prejudicial, *is not unfairly so*." *Id.* (emphasis added) (citing *Winston v. Commonwealth*, 32 Va. App. 864, 872 (2000)). "The danger of unfair prejudice can also be mitigated by an instruction to the jury that limits its consideration of other crimes evidence to its proper purposes and application to each offense charged." *Id.* at 148. Moreover, in a bench trial, as occurred here, "the trial judge is presumed to disregard prejudicial or inadmissible evidence, and this presumption will control in the absence of clear evidence to the contrary." *Pierce v. Commonwealth*, 50 Va. App. 609, 616 (2007).

Here, the Commonwealth established that the "other crimes" evidence tended to prove relevant facts pertaining to the offense charged: namely, a common scheme and the perpetrator's identity. The "other crimes" evidence addressed a matter genuinely in dispute, *Barlow v. Commonwealth*, 26 Va. App. 421, 428 (1998), and was not utilized unfairly to suggest the defendant had a propensity to commit crimes.[15] Similarly, the danger of prejudice from any "propensity inference" is diminished here in a bench trial.[16] Accordingly, we find that the trial court did not abuse its discretion in balancing the probative value and prejudice of the "other crimes" evidence and admitting it at trial.

---

[15] Where evidence of other crimes fails to support a fact genuinely in dispute, the evidence should not be admitted. *Guill v. Commonwealth*, 255 Va. 134, 138-39 (1998) (reversing conviction where evidence introduced was irrelevant to intent). Similarly, where tangential other crimes evidence seems calculated to inflame the passion of the jury, the evidence is properly excluded. *Cain v. Lee*, 290 Va. 129, 137-38 (2015) (upholding exclusion of evidence of a subsequent DUI charge that was calculated to stoke prejudice).

[16] Again, we presume that the judge who presided as fact finder at appellant's trial "disregard[ed] prejudicial or inadmissible evidence," as the record is devoid of "clear evidence to the contrary." *Pierce*, 50 Va. App. at 616. That presumption mitigates the "danger of unfair prejudice" to appellant resulting from admission of the "other crimes" evidence. *See Brooks*, 73 Va. App. at 148 (holding that limiting instruction to jury could mitigate "danger of unfair prejudice" from admitting "other crimes" evidence); *cf. Wilson*, 16 Va. App. at 223-24 (declining to presume trial court disregarded prejudicial evidence where it "erroneously and unconditionally" admitted evidence of prior drug distribution).

- 17 -

### C. The Trial Court Did Not Abuse its Discretion in Admitting the Google Records under the Business Records Exception to Hearsay

Appellant next contends that the trial court erred in admitting the Google records at trial because they lacked sufficient indicia of trustworthiness for admission under the business records exception to hearsay.

At trial, the Commonwealth sought to introduce a "Certificate of Authenticity" and accompanying letter that Google provided in response to Gathright's "secondary search warrant" requesting subscriber information for the two "suspicious device IDs" present at each theft. Appellant objected, arguing that the return was not admissible under the business records exception to hearsay because the documents lacked sufficient indicia of trustworthiness. Appellant argued that because neither document from Google explicitly referenced the two device IDs identified in the search warrant, there was "nothing on the Google response which would be a business record to connect it to the device." Appellant stipulated that the search warrant "requested specific information pertaining to a specific device" and that "Google produced a certified business record for Google information pertaining to [appellant]," but maintained that "Google may have made a mistake."

Google's letter accompanying the records certification did not explicitly reference the two anonymized device IDs. It explained, however, that "the Device ID (or device tag) is not a valid target identifier that can otherwise be used to search for information." Rather, "[t]he Device ID is used only for distinguishing unique devices in a particular user's location history." Therefore, "Google has only provided basic subscriber information . . . *for the requested devices*." (Emphasis added).

Additionally, the "Certificate of Authenticity" expressly stated that the records were certified by a proper custodian, that "Google servers record this data automatically at the time, or reasonably soon after, it is entered or transmitted by the user," and that "this data is kept in the

course of this regularly conducted activity and was made by regularly conducted activity as a regular practice of Google." The certification also states that the record is a "true duplicate of original records that were generated by Google's electronic process or system that produces an accurate result" and that Google "regularly verifie[s]" the "accuracy of [its] electronic process and system."

Gathright also testified regarding the typical protocol for obtaining Google records, stating that "[w]hen [police] request information in reference to the anonymized [device] number, [Google] respond[s] back with the subscriber information for the device i.d.'s that we requested." He confirmed that he received the letter and "Certificate" from Google in response to his search warrant. The trial court accepted that testimony and ruled that the return was admissible, finding that Google's response "came back in the ordinary course of business."

Appellant does not dispute that the records were otherwise admissible under the business records exception to hearsay. Rather, appellant's sole contention is that the documents lacked sufficient "indicia of trustworthiness" to qualify under the exception because neither document from Google explicitly referenced the two device IDs identified in the search warrant.

Rule 2:803(6) permits the introduction of business records at trial as an exception to hearsay if certain preconditions are satisfied[17] and "neither the source of information nor the

_____

[17] Rule 2:803(6) provides that "[a] record of acts, events, calculations, or conditions" if the following criteria are satisfied:

> (A) the record was made at or near the time of the acts, events, calculations, or conditions by--or from information transmitted by--someone with knowledge;
>
> (B) the record was made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making and keeping the record was a regular practice of that activity;

method or circumstances of preparation indicate a lack of trustworthiness." Va. R. Evid. 2:803(6)(E). In *Melick v. Commonwealth*, 69 Va. App. 122, 142 (2018), we observed that Rule 2:803(6)(E) is the "final condition necessary to establish that a document falls within the business records exception" and "is essentially an overarching check on the exception." "Thus, if there is some reason to doubt the trustworthiness of the source of the information or the circumstances of its preparation, the record will not fall within the exception even if the other requirements of Rule 2:803(6) have been established." *Id.* At the same time, "[t]he trustworthiness or reliability of the records is guaranteed by the regularity of their preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept." *Frank Shop v. Crown Cent. Petroleum Corp.*, 261 Va. 169, 175 (2001).

Here, while Thomas asserts the records could be erroneous, he offers no concrete "reason to doubt the trustworthiness" of the Google records. *Melick*, 69 Va. App. at 142. Although the Google letter did not explicitly reference the two anonymized device IDs, it explained why and disclosed the information "for the requested devices" in reference to Gathright's search warrant, which *did* expressly identify the two specific device IDs. Gathright also confirmed that he received Google's response in a manner consistent with typical protocol. Finally, Google's business records certification clearly established "the regularity of [the records'] preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept." *Frank Shop*, 261 Va. at 175. Appellant has thus failed to identify anything

<hr />

        (D)  all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 2:902(6) or with a statute permitting certification; and

        (E)  neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

in the record that "indicate[s] a lack of trustworthiness" of the Google records, either regarding "the source of information" or "the method or circumstances of preparation." Va. R. Evid. 2:803(6)(E). Accordingly, we cannot say that the trial court abused its discretion in admitting the records. *See Melick*, 69 Va. App. at 144 (affirming admission of business records where the certification and supporting testimony established their trustworthiness).

Appellant's complaints about the absence of device ID numbers on the Google records are "relevant to the trier of fact's assessment of its weight rather than its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122-23 (2019) (citing *Kettler & Scott, Inc. v. Earth Tech. Cos.*, 248 Va. 450, 459 (1994) (noting that once the "threshold for proving admissibility has been met, any gaps in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility")). It is well-established that "[t]he weight which should be given to evidence" is a question "which the fact finder must decide." *Bridgeman v. Commonwealth*, 3 Va. App. 523, 528 (1986). We will not overturn the trial court's admission of the evidence here.

## II. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to prove grand larceny and conspiracy to commit grand larceny. He asserts that the Commonwealth proved merely that a "cell phone using a number associated with [appellant]" was "in the vicinity" of the dealerships "at the time of the thefts." Appellant contends that the Commonwealth failed to prove his identity as the perpetrator because no evidence proved his possession of either the cell phone or any stolen property. Second, he argues that there was no evidence of "any agreement" to commit the thefts as required to prove conspiracy.

### A. Standard of Review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support

it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

B. The Evidence was Sufficient to Uphold Appellant's Convictions for Grand Larceny

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "Circumstantial evidence is not viewed in isolation." *Id.* (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

Here, the Commonwealth presented overwhelming evidence identifying appellant as the criminal agent. First, the geolocation and cellular data from appellant's cell phone established appellant's opportunity to commit the crimes. Police obtained appellant's cell phone number from the initial call informing police of the attempted sale of the stolen goods and then, upon checking the Bowie, Maryland lot, they discovered personal documents displaying appellant's contact information. Police used this information to identify appellant's Google account and telephone records. Based on those records, investigators determined that appellant's cell phone was present at the Augusta County, Hagerstown, and Hanover dealerships during the thefts, each of which occurred at night or in the early morning hours when no one would have a legitimate reason to be at the dealerships. Moreover, investigators traced the phone's movements to and from the dealerships, the Bowie lot where police discovered stolen equipment, and appellant's residence in Severn, Maryland. Finally, investigators discovered that appellant's phone searched for directions to the Campbell County dealership prior to that theft.

Collectively, that testimony firmly supported the rational inference that appellant had the opportunity to commit the thefts and did so. *See Brooks*, 73 Va. App. at 143 (affirming defendant's convictions for grand larceny where GPS location data established his truck's presence during each theft); *see also Edwards v. Commonwealth*, 68 Va. App. 284, 299 (2017) (affirming first-degree murder conviction where defendant's cell tower location records established his presence at the crime scene at the time of victim's murder).

Similarly, the Commonwealth presented significant evidence establishing appellant's unexplained, exclusive possession of recently stolen property from which the trial court could infer appellant's identity as the thief. *See Archer v. Commonwealth*, 26 Va. App. 1, 14 (1997) (inferring defendant's theft of a recently stolen firearm from his possession of it). A month after the Beverage Tractor thefts, and only two days following the Hanover theft, a caller reported that

appellant attempted to sell him a skid steer at the Bowie lot that was stolen from Hanover. Upon scouting the Bowie lot, police discovered the stolen Hanover skid steer on a trailer attached to the Ford F-350 stolen from Beverage Tractor—the same vehicle that was used to perpetrate at least three of the thefts.

Inside of a camper on the premises, police discovered a trove of documents bearing appellant's identifying information, including a document purporting to be a lease of the premises. Police also discovered additional documents belonging to appellant in a vehicle on the opposite side of the lot. That testimony supports the trial court's finding that appellant owned or controlled the premises where police uncovered the stolen property and, combined with the other evidence in this case, it supports the conclusion that appellant possessed the stolen property. *See Albert v. Commonwealth*, 2 Va. App. 734, 742 (1986) (holding that the evidence established that the defendant possessed contraband that was near "his wallet, identification papers and a bottle of prescribed medicine bearing his name").

The trial court also could infer appellant's consciousness of guilt from his affirmative acts of falsehood and efforts at concealment. *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992). At the Bowie lot, police found that the Ford F-350 stolen from Beverage Tractor bore a Maryland license plate that was not registered to it. Police also discovered several other stolen vehicles and pieces of construction equipment that had their VIN plates removed, and at least one had been "re-painted" from its original color. A rational inference from that evidence is that appellant attempted to disguise the stolen property in an effort to avoid police detection.

Additionally, following his arrest, appellant told police that he had never traveled to Virginia and that the cell phone number police ascribed to him belonged to his girlfriend. Yet overwhelming evidence established that the cell phone number belonged to appellant, and geolocation records proved that his phone was present in Virginia on multiple occasions. The

- 24 -

phone also contained various indicia that it belonged to Thomas, including photographs and videos. The phone was also linked to Thomas' Facebook and Google accounts. The trial court was entitled to reject appellant's protests that the phone was not his. *See Shackleford v. Commonwealth*, 262 Va. 196, 209 (2001).

In sum, the above evidence overwhelmingly established appellant's identity as the criminal agent.

C. The Evidence was Sufficient to Prove an Agreement Necessary to Establish Conspiracy

Finally, appellant argues that the evidence failed to prove that he conspired to commit the thefts because there was no evidence of an agreement to do so.

"Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Speller v. Commonwealth*, 69 Va. App. 378, 389 (2018) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). "The Commonwealth may prove the existence of a conspiratorial agreement by circumstantial evidence and need not prove an explicit agreement." *Id.* (citing *Gray v. Commonwealth*, 30 Va. App. 725, 736 (1999)). Thus, "a conspiracy may be inferred from the overt actions of the parties." *McQuinn v. Commonwealth*, 19 Va. App. 418, 425 (1994). "[W]here it is shown that the defendants by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or with a view to its attainment," a trial court may conclude that "they were engaged in a conspiracy to effect that object." *Amato v. Commonwealth*, 3 Va. App. 544, 552 (1987).

The record amply supports the trial court's finding of an agreement. Each theft involved two confederates collaborating to load Kubota skid steers onto company trailers and drive them away to Maryland for illicit re-sale, "one performing one part and the other performing another part." *Id.* In fact, the truck stolen in Augusta County was subsequently used to perpetrate similar thefts in the same manner.

In particular, the Beverage Tractor theft could not have been accomplished without two participants—the theft involved two people working together to load heavy machinery onto trailers and then hauling those trailers with two stolen pickup trucks. The surveillance video from the Beverage Tractor lot shows the two accomplices walking together through the lot, working together to maneuver the pickup trucks through the lot, and later the two trucks following each other out of the lot while towing the stolen equipment. That evidence was sufficient to prove an agreement necessary to establish conspiracy. *See Speller*, 69 Va. App. at 390 (affirming defendant's conviction for conspiracy to commit burglary where eyewitnesses saw three men enter the victim's home together, remove property, and leave together).

## CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

*Affirmed.*