UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, AtLee and Chaney
Argued at Fredericksburg, Virginia


RIGOBERTO RODRIGUEZ HERNANDEZ

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1888-22-4                  JUDGE MARY GRACE O'BRIEN
                                                         APRIL 30, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

(William D. Pickett, on brief), for appellant.  Appellant submitting
on brief.

Francis A. Frio, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Katherine Quinlan Adelfio, Assistant
Attorney General, on brief), for appellee.


        A jury convicted Rigoberto Rodriguez Hernandez (appellant) of first-degree murder as a

principal in the second degree and use of a firearm in the commission of a felony.  Appellant argues

that the court erred by denying his pretrial motions to suppress and to sever his charges.

Additionally, appellant contends that the court erred by finding the evidence sufficient to support his

convictions.  For the following reasons, we affirm.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

I.  The Shootings

On the evening of May 6, 2021, appellant, David Claros, Arline Bonilla, and Karla Rizo went to a restaurant in Sterling.  The group stayed until closing before leaving for Two Amigos, a bar in Chantilly.  They arrived around midnight and sat at the bar.  Approximately 30 minutes later, Edwin Gonzalez and Brian Campos arrived at Two Amigos.  The two men sat at the bar.  Sometime later, Bonilla noticed that appellant and Campos were staring angrily at each other from across the bar.

At approximately 1:30 a.m., the bartender observed a verbal altercation between appellant and Gonzalez and heard appellant say that they could take their problem outside.  The bartender ordered appellant and his party to leave the bar.  Appellant left with Claros, Bonilla, and Rizo. Gonzalez followed them into the parking lot and said something to appellant, who drew a firearm in response and fired one shot.  Claros grabbed appellant's arm, which changed the direction of appellant's shot.

Following this shot, Bonilla and Rizo went back to the bar.  The bartender threatened to call the police, and appellant and Claros left in appellant's gray Dodge.  Gonzalez remained at the bar with Campos, Bonilla, and Rizo until sometime after 2:00 a.m., when Campos drove Bonilla and Rizo home in Gonzalez's car.

Appellant later returned to Two Amigos.  The bartender saw appellant looking through the window and driving around the bar in his gray Dodge.  Campos returned to Two Amigos in

_____

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inference to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Gonzalez's car after dropping off Bonilla and Rizo. Campos parked behind the bar's rear door and was shot and killed in the roadway outside.

## II. The Forensic Investigation

Between 4:00 and 5:00 a.m. on May 7, Fairfax County Police found Campos laying in the roadway near Two Amigos. They observed a trail of blood and seven shell casings on the pavement—five .40 caliber rounds and two nine-millimeter rounds. Officers found one of each casing behind the restaurant near Gonzalez's vehicle, the other nine-millimeter casing near the front entrance of Two Amigos, and the remaining .40 caliber casings near Campos's body. An autopsy determined Campos's cause of death to be gunshot wounds to the head, torso, and extremities.

## III. Cell Phone Evidence

Appellant sent several text messages to Wilson Escobar in the early morning hours of May 7.[2] At 1:09 a.m., appellant texted "[t]hey already closed" and "[t]hey got them out, old man." At 1:11 a.m., Escobar responded, "[c]ome to the hotel then," and appellant replied, "[y]es, I'll just leave from [my] friend's and I'll stop[] by." Appellant left Chantilly and traveled north, where his phone activated a cell tower near Sterling at 2:13 a.m. Escobar's phone also activated this tower at 2:05 a.m.

Escobar received appellant's messages while out with Glenda Iraheta. In response, Escobar drove Iraheta back to his hotel where he dropped her off and retrieved a firearm from his room. He told Iraheta that he "needed it." Escobar loaded the weapon and left in a gray Dodge.

Surveillance footage from a neighboring business captured a vehicle matching the Dodge's description enter the Two Amigos parking lot just before 3:04 a.m. and speed away just before 3:06 a.m. Minutes later, Escobar's phone activated a cell tower in Chantilly just south of Two

---

[2] All of Escobar and appellant's messages were sent in Spanish and translated by Detective Patricia Kennedy at trial.

Amigos. Escobar's phone then traveled northwest through Loudoun County and activated a cell tower at 5:18 a.m. near the border of Jefferson County, West Virginia, where appellant's gray Dodge was later found ablaze.

Appellant sent several text messages after leaving Two Amigos, including one at 3:34 a.m., which read, "Some guys pressured me and I had to take one out." At 3:55 a.m. he texted, "I will have to set the car on fire." Cell site data tracked appellant's phone north from Chantilly, where it activated a tower near the West Virginia border at 4:43 a.m.

Hours later, at 9:18 a.m., appellant sent a text stating that his "car got stolen." Appellant also searched for and opened a news article about Campos's murder on his phone.

IV. Appellant's Dodge is Discovered

At approximately 5:10 a.m. on May 7, a West Virginia sheriff's deputy investigated reports of a vehicle fire under the Charles Town Road bridge in Jefferson County. He found the vehicle still in flames and discovered that it had a Dodge hubcap. Investigators determined that the fire was intentionally set. Additionally, the fire marshal recovered a partial vehicle identification number (VIN) from the vehicle.

On May 8, appellant reported his gray Dodge stolen. Appellant told Loudoun County Sheriff's Deputy Dorian Lambert that he left his gray Dodge after becoming heavily intoxicated on May 4, left his key on the passenger seat, and discovered the vehicle missing when he returned for it on the 8th. Appellant gave Deputy Lambert his phone number and the Dodge's license plate information, which Deputy Lambert used to find the Dodge's VIN. The Dodge's VIN matched the partial VIN recovered from the burned Dodge in West Virginia.

V. The Firearms Used in Campos's Murder Discovered in Escobar's Possession

On the evening of May 8, Loudoun County officers responded to a break-in at a furniture store and apprehended Escobar after a foot pursuit. The officers found a .40 caliber pistol beneath a

vehicle believed to be the "getaway car" in a nearby parking lot and a nine-millimeter firearm along the path of Escobar's flight. Forensic analysis confirmed that the shell casings recovered from the Two Amigos crime scene were discharged from these firearms. Further analysis established that Escobar's and appellant's DNA was on the grip of the nine-millimeter firearm, and Escobar's DNA was on the .40 caliber pistol and the .40 caliber shell casings found at Two Amigos.

## VI. Appellant's Interview

Detective Patrick Dittmer interviewed appellant on May 13. Before questioning began, Detective Dittmer advised appellant of his rights under *Miranda v. Arizona*[3] in both English and Spanish. Appellant confirmed that he understood his rights but refused to sign a "Miranda Rights Warning" form, stating, "I understand what you are telling me, but I cannot sign a piece of paper until a lawyer tells me."

When Detective Dittmer questioned appellant, he denied involvement in either shooting and told Detective Dittmer that he was at home sleeping. He also denied touching any firearms. After approximately 40 minutes of questioning, appellant told Detective Dittmer that he "need[ed] a lawyer" to answer "any questions [he] had from now." The detective terminated the interview.

## VII. Appellant's Motions to Sever and to Suppress

In December 2021, a grand jury indicted appellant for attempted malicious wounding, brandishing a firearm, first-degree murder, and use of a firearm in the commission of murder. Appellant moved to sever the attempted malicious wounding and brandishing charges from the murder and use of a firearm in the commission of murder charges. He argued that the charges related to the first shooting toward Gonzalez were too distinct in time, place, and character to be tried together with the charges related to Campos's murder and that doing so would be highly prejudicial to him. The Commonwealth opposed severance and proffered that it would use the

---

[3] 384 U.S. 436 (1966).

- 5 -

evidence of the first shooting to prove premeditation and motive for Campos's murder. The court denied appellant's motion, citing the involvement of common witnesses, the travel back and forth to the crime scene, and the earlier interaction between appellant and the two shooting victims.

Appellant also moved to suppress his statements to Detective Dittmer, claiming they resulted from unlawful questioning after he had invoked his right to counsel. The court denied the motion, reasoning that neither appellant's statement, nor his refusal to sign the *Miranda* form, clearly invoked the right. The court further noted that an officer does not need to "get an express[] waiver either orally or in writing."

## VIII. Trial

At trial, the Commonwealth argued that appellant acted as a principal in the second degree in Campos's murder. The Commonwealth contended that appellant was present at the time of the murder, acted in concert with Escobar, and shared the necessary intent to commit the crime. The Commonwealth also argued to the jury that appellant lied to Detective Dittmer in his interview and pointed to evidence contradicting the statements he made.

After the close of the Commonwealth's evidence, appellant moved to strike the attempted malicious wounding and brandishing charges. The court agreed and struck both charges. However, the court reaffirmed its earlier ruling joining the four charges, reasoning that the evidence of the first shooting would have been admissible to prove the murder charge because of the firearm's connection to both events.

## ANALYSIS

## I. Joint Trial

Appellant challenges the court's denial of his motion for separate trials. He contends that the two shootings were "clearly two separate acts or transactions, separated by time, place, and victims" and that a joint trial was "extremely prejudicial." The Commonwealth responds that the

charges were properly tried together because the facts established a closely connected "course of criminal conduct."

Rule 3A:10(c) permits an accused to "be tried at one time for all offenses then pending against him, if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)." "Under Rule 3A:6(b), two or more offenses may be joined in a single indictment 'if the offenses are based on the same act or transaction, or on two or more acts or transactions that are [a.] connected or [b.] constitute parts of a common scheme or plan.'" *Castillo v. Commonwealth*, 70 Va. App. 394, 413-14 (2019) (alterations in original) (quoting *Scott v. Commonwealth*, 274 Va. 636, 644 (2007)). Offenses are "connected" if they are "so intimately connected and blended with the main facts adduced in evidence[] that they cannot be departed from with propriety." *Holloman v. Commonwealth*, 65 Va. App. 147, 159 (2015) (alteration in original) (quoting *Spence v. Commonwealth*, 12 Va. App. 1040, 1044 (1991)). "A reviewing court must look to whether the transactions were 'closely connected in time, place, and means of commission, all of which supports the use of a single trial.'" *Doss v. Commonwealth*, 59 Va. App. 435, 449 (2012) (quoting *Yellardy v. Commonwealth*, 38 Va. App. 19, 24 (2002)).

"The question [of] whether an accused, pursuant to Rule 3A:10(c), can be tried in a single trial for all offenses then pending against that defendant is a matter resting within a trial court's sound discretion" and will not be reversed absent an abuse of that discretion. *Brooks v. Commonwealth*, 73 Va. App. 133, 141 (2021) (quoting *Commonwealth v. Minor*, 267 Va. 166, 172 (2004)).

Here, the court did not abuse its discretion in finding that the four offenses were "connected" under Rule 3A:6(b). The record reflects that the shootings occurred within approximately two hours in the early morning of May 7, and both outside Two Amigos. Indeed,

- 7 -

officers discovered Campos's body in the street within a few hundred feet of the bar where appellant first fired his weapon. The nine-millimeter handgun with appellant's DNA was involved in both shootings and found with Escobar the following day. The record also reflects that Campos and Gonzalez arrived together and had a negative interaction with appellant. Further, appellant's text messages communicating his need to "take . . . out" one of the "guys" that "pressured" him provided evidence of his motive in the second shooting.

Additionally, justice did not require severance. "Justice requires separate trials where the evidence of one of the crimes is not admissible in the trial of the other." *Castillo*, 70 Va. App. at 414 (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 123 (1988)). Generally, evidence of an accused's other crimes, wrongs, or bad acts is inadmissible if used to establish their propensity to commit the crime for which they are being tried. *Id.* However, such evidence is admissible, where it is instead used "to prove motive to commit the crime charged" or "to show the conduct and feeling of the accused toward his victim, or to establish their prior relations." *Id.* at 415 (quoting *Quinones v. Commonwealth*, 35 Va. App. 634, 640 (2001)). The charges were properly tried together because the events surrounding the first altercation at Two Amigos served as evidence of his motive and intent for the murder by showing a prior conflict between appellant, Gonzalez, and Campos. *See* Va. R. Evid. 2:404. Accordingly, its probative value exceeded any incidental prejudice. *See Castillo*, 70 Va. App. at 417. That the trial court ultimately struck the attempted malicious wounding and brandishing charges cannot color our review of the trial court's pretrial determination that evidence of the first altercation would have been admissible in a separate trial for Campos's murder. *See, e.g.*, *Allen v. Commonwealth*, 58 Va. App. 618, 620-21 (2011) (noting that an appellate court considers both the proffers at the pretrial hearing and the evidence presented at trial when affirming a ruling made prior to trial). Thus, the trial court did not abuse its discretion by denying appellant's motion to sever the charges.

## II. Motion to Suppress

Appellant argues that the court erred by denying his motion to suppress his statements to Detective Dittmer. He contends that he unequivocally invoked his right to counsel when he said, "I understand what you are telling me, but I cannot sign a piece of paper until a lawyer tells me." Even assuming without deciding that the court erred by denying appellant's motion to suppress, any such error was harmless. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt . . . ." *Lilly v. Commonwealth*, 258 Va. 548, 551 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). In doing so, this Court must ask whether the "verdict would have been the same absent the error" beyond a reasonable doubt. *Neder v. United States*, 527 U.S. 1, 17 (1999). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points" and "the overall strength of the prosecution's case." *Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (all but first alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

During the interview, appellant did not confess; rather, he denied the criminal allegations. The Commonwealth merely used appellant's statements to argue to the jury that appellant's claim of innocence was a lie that had been "proven false" by the evidence. Appellant's statements were far from crucial to the Commonwealth's case and cumulative of other evidence establishing appellant's guilt. *See Commonwealth v. White*, 293 Va. 411, 423 (2017) ("We can

confidently [conclude the error was harmless beyond a reasonable doubt] based upon the limited role that the challenged evidence played at trial, coupled with the overwhelming . . . evidence of [appellant]'s guilt.").

Officers found shell casings at the scene which were fired by a gun with appellant's DNA on it. Several witnesses testified that appellant was at the scene holding a firearm in his hand during the first altercation, and the bartender testified that appellant argued with Gonzalez before firing the weapon. Appellant's text messages and cell site location data established his movements before and after the fatal shooting, including his subsequent travel to West Virginia to destroy his Dodge. Ultimately, the Commonwealth did not rely on appellant's statements as substantive evidence of guilt, but instead used them to highlight the strength of its other evidence. Therefore, this Court concludes "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error," if any. *Neder*, 527 U.S. at 18.

### III. Sufficiency of the Evidence

Lastly, appellant contends that the evidence was insufficient to support his convictions for murder and use of a firearm in the commission of murder.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "This deferential standard of review 'applies not only to the historical facts themselves, but the inferences from those facts as well.'" *Johnson v. Commonwealth*, 53

Va. App. 79, 100 (2008) (quoting *Crowder v. Commonwealth*, 41 Va. App. 658, 663 n.2 (2003)). "The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." *Id.* (quoting *Hancock v. Commonwealth*, 12 Va. App. 774, 782 (1991)).

Appellant does not argue that the Commonwealth failed to prove any specific elements of the charges, rather, he contends that the evidence showed "only a suspicion" of his guilt, and instead "tended to show that . . . Escobar was more likely the shooter." He notes that investigators found Escobar's DNA on the murder weapon and on shell casings near the body and that cell tower data put Escobar on scene at the time of the shooting. In contrast, he argues, his DNA was found "only on the handle of a second gun" and that "cell phone tower data suggested that [he] was not at the location of the shooting when it occurred."[4]

In this case, the Commonwealth prosecuted appellant as a principal in the second degree and thus did not need to prove that he fired the fatal shot. "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." *Lebron v. Commonwealth*, 58 Va. App. 540, 553 (2011) (quoting *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008)). "In order to convict an accused as a principal in the second degree, the Commonwealth must prove 'that the defendant procured, encouraged, countenanced, or approved the criminal act.'" *Id.* at 553-54 (quoting *McMorris*, 276 Va. at 505).

---

[4] Escobar's cell phone was active at the scene of the shooting just after 3:00 a.m. Although appellant's phone did not activate any cell towers at that time, the Commonwealth's expert witness explained that a lack of cell phone location data may simply mean that no calls were being sent from or received by the device during that period.

Here, the evidence presented at trial proved that appellant had an argument with Gonzalez, fired a shot in response, left the scene, contacted Escobar, and the two men returned to Two Amigos together. Security footage from a nearby store showed appellant's gray Dodge driving around Two Amigos near the time of the shooting, and the bartender saw appellant looking through the windows of the bar after his initial flight. At approximately 3:34 a.m., appellant sent a text which read, "Some guys pressured me and I had to take one out." At 3:55 a.m. he texted, "I will have to set the car on fire." The cell site data showed that appellant then traveled to West Virginia with Escobar, set his Dodge ablaze, and fabricated a story about the theft of his vehicle. Finally, appellant's DNA was present on one of the guns that fired shell casings involved in the shootings.

From these facts, we find that a rational finder of fact could find that appellant committed "some overt act . . . in furtherance" of Campos's killing and thus was guilty of first-degree murder as a principal in the second degree and use of a firearm in the commission of a felony. *Lebron*, 58 Va. App. at 553.

## CONCLUSION

For these reasons, we affirm the court's judgment.

*Affirmed*.